UNITED STATES of America,
Plaintiff-Appellee,

v.

Jose CASTRO, Defendant-Appellant.

No. 79–1542.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 13, 1980.

Decided July 17, 1980.

Mary L. Sfasciotti, Kenosha, Wis., for defendant-appellant.

Thomas P. Sullivan, U. S. Atty., Jeffrey E. Rogers, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before FAIRCHILD, Chief Judge, SWY-GERT and CUMMINGS, Circuit Judges.

SWYGERT, Circuit Judge.

In this appeal we hold that the defendant's conviction of conspiracy to distribute heroin must be reversed on the basis of the Double Jeopardy Clause. Additionally, his conviction on the substantive charge of distributing heroin is reversed and remanded for a new trial.

I

In order to appreciate the issues raised on appeal, a full discussion both of the factual and the procedural underpinnings of this case is necessary.

*The Factual Background*

On September 13, 1977 two officers of the Puerto Rican police department, Jose Menendez and Jose Garcia, met with an informant named Rubio, at defendant-appellant Jose Castro's bar in Las Hoyas, Puerto Rico. At that meeting Agent Menendez, who was introduced to Castro by the informant, asked Castro for help in locating a good heroin connection in Chicago. Defendant said he could be of assistance, and gave Menendez a slip of paper on which defendant had written "Johnny El Loco, 1036 California Street, Chicago, Illinois." Two days later, on September 15, 1977, Agent Menendez, Agent Garcia, and the informant went to the Chicken and Pizza Palace in Ponce, Puerto Rico, where they met Carlos Ramos, the stepson of defendant. Ramos offered to take the agents to Chicago to locate a heroin connection. He said that first, however, he would obtain the connection's telephone number from his stepfather, the defendant, and would call El Loco to find out if there was any heroin for sale. The following morning the same four men met at Rubio's home. There Ramos related the substance of his telephone call to Chicago: two kilos of heroin were available for purchase, but the agents would have to travel to Chicago to discuss personally the sale with the connection. Agent Menendez told Ramos that he (Menendez) would discuss the matter with his money man and get back in touch with Ramos.

On September 19, 1977 Ramos and Agent Menendez met, at which time Ramos instructed Agent Menendez to buy him (Ramos) an airplane ticket to Chicago, where Ramos lived. The following day Agent Menendez, Rubio, and defendant met at defendant's bar where he was told about the agent's plan to travel with Ramos to Chicago; Castro told the agent "to be cautious and take it slow." On September 26, 1977, defendant arrived at the San Juan International Airport with his stepson Ramos, Ramos' wife, and her brother. Agent Menendez and Ramos went to the airport bar for a drink, and Agent Menendez told Ramos that when they arrived in Chicago he would introduce his money man to Ramos and, in turn, Ramos should introduce his source, Johnny El Loco, to the money man. Castro then joined the men at the bar, instructing them not to let the "Mexican" know that defendant was unable to travel because he was still on probation from a prior conviction. Agent Menendez, Ramos, and his family then departed for Chicago.

Upon their arrival, Agent Menendez and Ramos went to the Grand Plaza Hotel in Rosemont, Illinois. In the hotel bar, Ramos was introduced to Agent Amador, a Puerto Rican police officer, as Agent Menendez' money man. The men agreed that El Loco and Agent Amador would be introduced to each other the next day. That plan, however, never materialized. The following day Ramos told the undercover agents that he had not been able to contact El Loco. In hopes of locating the source themselves, Ramos and Agent Menendez went to the California Street address which Castro had given to Menendez at their first meeting on September 13, 1977. The address was the "La Muralla" bar. There the agent and Ramos inquired without success about El Loco. Consequently, Menendez and Ramos returned to the agents' hotel and Ramos told both Agent Menendez and Agent Amador that he would continue searching for El Loco. Having heard no word from Ramos and becoming impatient, the agents went to Ramos' home that evening. He was not there; however, the agents talked with an unidentified woman in the building who called Ramos from her apartment. Ramos told Agent Menendez that he still could not find El Loco, but that if he did he would contact him.

The following morning, September 28, 1977, Agent Menendez met Ramos at his home in Chicago. Having abandoned his efforts to locate El Loco, Ramos told Menendez that he had found another source,

named "Alejo," who had one kilo of heroin available for immediate delivery. It was arranged that Ramos, Alejo, and the two agents, Menendez and Amador, would meet later that evening. At that time, Ramos and the brother of Alejo, who called himself "Acapulco Joe," met with the agents at their hotel. Acapulco Joe requested $30,000 for the kilo "in front"; Agent Amador refused the demand. The following day, September 29, 1977, Agent Menendez telephoned Acapulco Joe, who told the agent that when his brother Alejo returned, he would be ready to deliver the heroin. Following a series of phone calls between the agents and Ramos, and Ramos and Acapulco Joe, the delivery was arranged for that day at Ramos' home. Pursuant to the arrangement, Agents Menendez and Amador purchased the kilo of heroin from Alejo and his brother for $30,000.

Two days later, October 1, 1977, the same agents met with Ramos at the Star Cafe in Chicago.[1] The agents requested Ramos to locate the "Mexican" in Chicago for an additional purchase of heroin—five or ten kilos.[2] Once the contact was made, they said, Ramos was to call the agents in Puerto Rico and they again would return to Chicago to purchase the drugs. Ramos agreed with the plan, stating that the supplier, Marcial Perez, was then vacationing and that he (Ramos) and the defendant had dealt with Perez on previous occasions. The following day the agents, prior to leaving Chicago, met with Ramos and repeated their intent to return to Chicago with the money when Ramos had made the connection with the "Mexican," Perez.

On October 11, 1977 Ramos telephoned Agent Menendez in Puerto Rico and told him that the "Mexican" had two kilos of heroin and was expecting two more. Because the agent was interested in a larger amount, he told Ramos they had better wait for the second amount. Agent Menendez then visited Castro at his bar. He related to the defendant the problems he and Officer Amador had encountered in Chicago trying to locate both El Loco and the Mexican and that neither of the men had been found. Castro commented that he had experienced problems in the past with his stepson's handling of drug transactions, at which time Menendez asked Castro to go to Chicago with him. The defendant replied that he would first have to obtain permission to travel.

On October 19, 1977 Agent Menendez, the informant Rubio, and defendant met at Castro's bar. At that meeting Menendez requested Castro to contact his stepson in Chicago and to inquire whether Ramos had located the Mexican. The agent again attempted to persuade Castro to personally handle the transaction in Chicago; the defendant said he would let Agent Menendez know during the following week whether he could get permission to travel to Chicago because of his legal restrictions. The two men arranged to meet again. On October 28, 1977, Castro, after stating that he could not travel to Chicago, told Agent Menendez that he would call Ramos and tell him to arrange a purchase of five or ten kilos of heroin so that the agent could fly to Chicago to buy it. Agent Menendez then told Castro that, following his return from Chicago, the agent would contact Castro about future drug transactions; the defendant agreed.

On November 1, 1977 Agents Menendez and Amador flew to Chicago and, upon their arrival, obtained Government funds in the amount of $150,000 in cash. With a special agent posed as the taxi driver, the two agents took a cab to Ramos' residence, where Agent Menendez informed Ramos that Agent Amador was ready, with cash, to make the purchase. Ramos, after talking with Amador and having seen the money, told the agents that the Mexican was

---

1. The events which transpired between the September 26, 1977 meeting at the San Juan airport and the October 1, 1977 meeting at the Star Cafe were brought forward only at the second trial.

2. The record is unclear whether the agents were referring to Johnny El Loco or a new supplier. Further discussion shows that Agent Menendez now concentrated on Marcial Perez as a future source.

waiting for them in Aurora, Illinois. Ramos and Agent Menendez then rode in the taxi to a Burger King restaurant in Aurora, where they met Perez, the Mexican. The men planned that Perez would give five kilos of heroin to Agent Menendez, who would deliver the purchase to Agent Amador, and that Ramos would pick up the money and return to Aurora to pay Perez. The three men then went to the residence of Perez, where he gave Agent Menendez a shopping bag containing ten packages of heroin. When Menendez left Perez's home, Ramos and Perez were arrested.

*The Procedural Background*

On the basis of the events summarized above, two indictments were brought approximately three weeks apart from each other by the Government against the defendant Jose Castro. One indictment (hereafter "the first indictment"), brought on February 2, 1978, charged Castro with conspiracy to distribute heroin in violation of 21 U.S.C. § 846, and distribution of approximately five kilograms of heroin in Aurora, Illinois on November 1, 1977 in violation of 21 U.S.C. § 841(a)(1). The conspiracy count covered the period from September 1977 through February 1978 (when the indictment was returned) and alleged that on those dates Castro conspired with Perez, Ramos, Salvadore Urbina-Acosta, and other persons who were unknown to the grand jury. On July 28, 1978 following a jury trial, Castro, the sole defendant, was found not guilty both on the conspiracy count and the substantive count.

A second trial, where Castro again was the only defendant and which is the subject of this appeal, resulted in a judgment of conviction on February 28, 1979 following a jury verdict. The indictment from which the conviction arose (hereafter "the second indictment") was brought on January 12, 1978 and again charged defendant with two criminal counts. The first alleged that the defendant conspired with Ramos, Acapulco Joe, and Alejo to distribute heroin. The conspiracy was alleged to have begun in the summer of 1977 and continued until November 1977 when Castro and the co-conspirators were arrested. Thus, the conspiracy set forth in the second indictment was alleged to have begun prior to the one alleged in the first indictment, but to have extended over a portion of the period—the months of September, October, and November of 1977—when the conspiracy set forth in the first indictment was alleged to have occurred. The second count of the second indictment charged the distribution of approximately one kilogram of heroin on September 29, 1977 in Chicago. At the second trial and in post-trial proceedings, defendant moved to dismiss both counts of the indictment on the grounds of double jeopardy and collateral estoppel based on Castro's prior acquittal. The district court denied the motions, and Castro was sentenced to four years imprisonment on each count to run concurrently, followed by a special parole term of three years on each count. This appeal followed.

## II

The defendant contends, as he did in the trial court, that the Government has taken one overall conspiracy and dissected it into two smaller conspiracies. Thus, he argues, the prosecution for conspiracy in the second case, foreclosed by his acquittal in the first trial, was in violation of the Double Jeopardy Clause of the Fifth Amendment. The Government's theory of the case is that the evidence elicited at both trials shows two vertical chain conspiracies. In resolving this case, we focus our attention on two questions: (1) whether the combinations of persons in the first and second alleged conspiracies were encompassed by the same agreement and (2) if so, whether after a jury acquittal the Government was foreclosed from prosecuting Castro in another trial for conspiracy and distribution of heroin on the basis of the collateral estoppel doctrine.

To answer the first question, we begin with the basic tenets of criminal conspiracy law. The Fifth Amendment in part provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." This provision serves principally as a restraint on over-zealous

prosecutors and courts. *Brown v. Ohio*, 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977). In the realm of criminal conspiracies, it is settled that the prosecution of a single conspiracy as two separate conspiracies violates a defendant's double jeopardy guarantee. *Braverman v. United States*, 317 U.S. 49, 53, 63 S.Ct. 99, 101, 87 L.Ed. 23 (1942); *United States v. Tanner*, 471 F.2d 128, 141 (7th Cir.), *cert. denied*, 409 U.S. 949, 93 S.Ct. 269, 34 L.Ed.2d 220 (1972). Courts have held that the Double Jeopardy Clause shall apply even if some of the named co-conspirators are different in the two indictments, *United States v. Mallah*, 503 F.2d 971 (2d Cir. 1974), *cert. denied*, 420 U.S. 995, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975), and even if the two indictments allege different overt acts, *Short v. United States*, 91 F.2d 614 (4th Cir. 1937).

In claiming double jeopardy based on more than one conspiracy prosecution, a defendant bears the burden of establishing that the prosecutions are for the same offense in law and in fact. The task is not an easy one because "[b]y the nature of the crime, the precise bounds of a single conspiracy seldom will be clear from the indictment alone. The gist of the crime of conspiracy and the characteristic which defines its breadth is the unlawful agreement." *United States v. Marable*, 578 F.2d 151, 153 (5th Cir. 1978).

In proving that the first and second alleged conspiracies are one, a defendant traditionally has been required to meet the "same evidence" test, that is, to show that the evidence required to support conviction in one of the prosecutions would have been sufficient to support a finding of guilt in the other prosecution. See *United States v. Buonomo*, 441 F.2d 922, 925 (7th Cir.), *cert. denied*, 404 U.S. 845, 92 S.Ct. 146, 30 L.Ed.2d 81 (1971). This test, however, would seldom prevent multiple prosecutions in narcotics conspiracy cases, such as this

one, because the Government can shape the overt acts charged in each indictment and thus, under the guise of prosecutional discretion, advance the proposition of one conspiracy's being capable of proof in several prosecutions requiring different evidence for each conviction. To determine whether a conspiracy has been subdivided arbitrarily, resulting in multiple indictments for a single illegal agreement, courts therefore will look to both the indictments and the evidence and consider such factors as whether the conspiracies involve the same time period, alleged co-conspirators and places, overt acts, and whether the two conspiracies depend on each other for success. Where several of these factors are present, the conclusion follows that the alleged illegal combinations are not separate and distinct offenses. *United States v. Marable, supra*, 578 F.2d at 154; *United States v. Mallah*, 503 F.2d 971 (2d Cir. 1974), *cert. denied*, 420 U.S. 995, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975); *United States v. Cooper*, 442 F.Supp. 1259 (D.Minn.1978). Following this broader approach,[3] we now turn to a determination of whether the two separate agreements alleged by the Government in this case are one.

It is defendant's position that both the indictment and the evidence adduced at trial reveal one ongoing business relationship entered into by Agent Menendez, defendant, and Ramos to provide Agent Menendez with a heroin connection. To support his position that there is only one conspiracy, defendant asks this court to consider the offenses charged in the indictments, the members of the conspiracies, the time periods, the overt acts, and the locations where the events allegedly occurred. Having reviewed these factors, we conclude that the conspiracy charged in the second indictment, which occurred first in time, is but a part of the conspiracy charged in the first indictment.

**3.** Although this court has not expressly recognized the distinction between the strict "same evidence" test and the broader approach for purposes of determining multiple conspiracies in narcotics conspiracy cases, it has examined the evidence for common facts to find the number of conspiracies that exist. *See, e. g., United States v. Lawson*, 545 F.2d 557, 560 (7th Cir. 1975).

Both indictments charged the defendant in count one with conspiracy to distribute heroin in violation of 21 U.S.C. § 846. The first indictment charged the defendant in count two with distributing approximately five kilograms of heroin on November 1, 1977 in Aurora, Illinois as proscribed by 21 U.S.C. § 841(a)(1). The second indictment also charged the defendant in count two with violating 21 U.S.C. § 841(a)(1) by allegedly distributing approximately one kilogram of heroin on September 29, 1977, in Chicago.

The same core conspirators—defendant Castro and his stepson Ramos—were named in both indictments and proof at the trials shows they were involved in the two heroin negotiations. Additionally, Agents Amador and Menendez, the same undercover officers who negotiated with Castro and Ramos for delivery of one kilogram of heroin on September 29, 1977, were the same officers who negotiated with Ramos and Castro for the November 1, 1977 delivery. The only distinction between the two indictments is that the negotiation involved different suppliers: Marcial Perez and Urbina-Acosta were the alleged suppliers in the first indictment, and the Santiago brothers were named as suppliers in the second indictment. In both of the alleged conspiracies, all of the overt acts occurred either in Puerto Rico or the Chicago area.

The agreement charged as the basis of the second indictment and the agreement that formed the basis of the first overlapped for a substantial period of time. A reading of the indictments reveals that the conspiracy with which Castro was charged in the first trial extended from September, 1977 to February 2, 1978 and the conspiracy at issue here began in the summer of 1977 and extended until November, 1977 when the alleged co-conspirators were arrested. The proof at the first trial showed not merely an overlap of time but that the conspiracy charged in the second indictment

was encompassed by the conspiracy charged in the first indictment. The Government contended at the second trial that that conspiracy began with the September 13, 1977 meeting between Castro and Agent Menendez and terminated on September 29, 1977 with the distribution of the heroin to the undercover agents. At the first trial, the Government attempted to show that the conspiracy commenced on October 1, 1977, with the meeting between Ramos and the undercover agents, Menendez and Amador, at the Star Cafe. That conspiracy was alleged to have terminated on November 1, 1977. The proof in the first trial, however, began with the September 13, 1977 meeting. The last conspiratorial act elicited in the first trial was November 1—the same date that the conspiracy in the second indictment allegedly ended and approximately five weeks beyond the termination of the second trial's conspiracy. There was no proof in either case that the conspiracies extended beyond November 1, 1977. Thus, the evidence in the first trial showed that the conspiracy set forth in the second indictment occurred entirely within the time frame of the conspiracy which the Government attempted to prove in the first trial.

A comparison of the overt acts alleged in the indictments, in addition to the proof on overt acts in both trials, reveals one collective agreement to distribute heroin.[4] The indictment at issue here charged five overt acts: September 13, September 15, September 26, September 28, and September 29. The first indictment charged six: September 26, October 1, October 11, October 28, and two on November 1. Curiously, both indictments allege that a meeting occurred on September 26, 1977. The first indictment charges that defendant Castro and Ramos met with Agent Menendez at the San Juan airport on that date, and the second indictment charges that on September 26, 1977 "Carlos Ramos and an under-

---

4. Unlike the traditional conspiracy case under 21 U.S.C. § 846, the Government in this case was required to allege and to prove an overt act to sustain a proof of conspiracy conviction. See *United States v. Marable, supra,* 578 F.2d at 153–54. The allegations of overt acts and their proof are instructive in determining the nature and scope of the two alleged conspiracies.

cover Puerto Rican police officer boarded an airplane in San Juan, Puerto Rico bound for Chicago, Illinois." The Government said in the trial court that the first indictment's allegation of an overt act on September 26, 1977 "was error" because its theory of that case was that the conspiracy did not begin until several days later on October 1, 1977, when the conversations at the Star Cafe occurred. The indictments also reveal that the second conspiracy (alleged in the first indictment) was formed two days after the first was alleged to have terminated (September 29) by the same agents and co-conspirator (Ramos) who were involved in the first conspiracy.

We further believe that pieces of evidence adduced at both trials, when put together, support the defendant's position that there was only one conspiracy. Although the Government attempted to prove at the first trial that the conspiracy did not begin until October 1, pre-October 1 conversations were admitted into evidence. Specifically, the conversations of September 13 (initial meeting between Agent Menendez and defendant), September 15 (Ramos told the agent that he would obtain the heroin connection's telephone number from the defendant), September 20 (defendant and Menendez discuss Menendez's trip to Chicago), and September 26 (defendant, Ramos, and Menendez meet at airport) were testified to at the first trial. Three out of·the four of these conversations, September 13, 15, and 26, were overt acts in the second indictment and testified to at the second trial. The Government argues that the fact that some pre-October 1, 1977 conversations were testified to at both trials does not imply that one agreement,·rather than two successive agreements, was made between Castro and Ramos; the conversations were offered, the Government argues, to provide background information without which a full understanding of the post-September 29 conversations is impossible. We believe that argument supports rather than weakens defendant's contention that the transactions were interrelated to such an extent that only by considering both transactions can an understanding of the agreement itself be had. Additionally, the Government concedes that this evidence was not limited at the first trial by an instruction that it was admitted solely to show the prior working relationship between Castro and Ramos.

An examination of the evidence of post-September 29, 1977 conversations shows the continuous nature of the conspiracy. On October 1, 1977, two days after the first sale, Agents Menendez and Amador met with Ramos in Chicago. The agents asked Ramos to locate the "Mexican" for an additional purchase of heroin; Ramos agreed, informing the agents that he and Castro had used the Mexican as a supplier previously. This evidence was not admitted at the second trial. However, the two meetings at defendant's bar between Menendez and Castro, which occurred on October 11, 1977 and October 19, 1977, were admitted into evidence at the second trial, even though the Government's theory in that trial was that the conspiracy ended on September 29, 1977. At the first of these two meetings, Agent Menendez lamented to defendant that he had had problems locating the suppliers, Johnny El Loco and the Mexican. He also asked Castro to go to Chicago with him to help with the second purchase. (This testimony was not put into evidence in the second case.) At the second meeting Agent Menendez asked the defendant to telephone Ramos in Chicago and to ask whether Ramos had contacted the Mexican. The evidence adduced at the first trial reveals that at the final meeting between these two men, which occurred one week later, Agent Menendez and Castro discussed the possibility of future drug transactions.

Summarizing the above factors, we find that the alleged conspiracies involved the same objective (to distribute heroin), the same core participants (Carlos and Ramos), the same place of distribution (Chicago area), and the same time period (September 13, 1977 to November 1, 1977), and the same method of operation (Ramos and Castro contact Chicago suppliers; Ramos arranges purchase meetings and is present at those meetings). Only when the facts adduced at both trials are pieced together, does the

existence of one continuous agreement crystalize. As we view the conspiracy, it began at the Las Hoyas bar on September 13, 1977. In response to Agent Menendez's request for a good heroin connection, Johnny El Loco was suggested. That initial supplier never appeared and no sale was consummated, but Castro and Ramos were able to locate other suppliers who furthered the original purpose of the conspiracy. The conspiracy terminated on November 1, 1977 when the co-conspirators were arrested. Thus, the situation here is different from *Kotteakos v. United States*, 328 U.S. 750, 758, 66 S.Ct. 1239, 1244, 90 L.Ed. 1557 (1946), upon which the Government relies. There the Court found that each separate conspiracy had its own distinct illegal end. Here that critical element is lacking from the evidence.

■■■ The Government raises several points about the validity of Castro's claim that only one conspiracy is involved in this case. First, it contends that the record is devoid of evidence that the two groups of suppliers knew each other, or even had reason to know that they were involved in a larger project for the illegal distribution of heroin, and therefore there is not one but two illegal schemes in this case. One of the basic tenets of conspiracy law, however, is that an alleged co-conspirator may be included in an overall agreement without knowing all of the participants in the conspiracy. The law of criminal conspiracy also provides that new conspirators may join the criminal agreement after its inception, and others may terminate their membership in the conspiracy before its completion. *United States v. Varelli*, 407 F.2d 735, 741–42 (7th Cir. 1969), *cert. denied sub nom., Saletko v. United States*, 405 U.S. 1040, 92 S.Ct. 1311, 31 L.Ed.2d 581 (1972). The Government correctly argues that the imputed knowledge rule mentioned above has generally been applied to cases involving narcotics dealings larger than those that transpired here. This court, however, has never held that only in large drug trafficking cases may the knowledge of each supplier be presumed. More importantly, the change in the suppliers did not consti-

tute in this case any material alteration of the original scheme between Ramos and the defendant.

The Government also contends that there are two conspiracies here because there is no evidence that the second delivery of heroin on November 1, 1977 had been discussed before the alleged first conspiracy ended. We believe, however, that the failure of such evidence to appear on the record does not establish two conspiracies. Reference to the pre-September 29, 1977 conversations discussed above substantiates our conclusion that the essence of the agreement was to provide a good supply of heroin to Agent Menendez, rather than to provide a specific amount.

In spite of the Government's urging, we are not compelled to engage in a lengthy exegesis on whether this is a conspiracy of the chain variety or the wheel variety. The facts suggest that neither of the classic criminal conspiracy theories is appropriate here and actually, both are irrelevant because it is the core conspirator—whether he is labelled the main link or the hub—who is advancing this appeal. That fact distinguishes this case from those where a decision on the type of conspiracy alleged by the Government is necessary. *See, e. g., United States v. Lindsey*, 602 F.2d 785 (7th Cir. 1979). In conclusion, we find that there was only one conspiracy when the Government alleged two.

### III

Having determined that the two alleged conspiracies were one, the next and final question presented by this case concerns the implications of that finding on defendant's judgment of conviction in the second trial. Our inquiry begins with the doctrine of collateral estoppel.

■■ In *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), the Supreme Court established that the doctrine of collateral estoppel, which is an aspect of the Double Jeopardy Clause, applies to multiple prosecutions. When applied, the doctrine precludes further prosecution where

an issue of ultimate fact has been resolved in a defendant's favor by a valid and final judgment in a prior proceeding between the identical parties. *Id.* at 443, 90 S.Ct. at 1194. As a result, it may afford double jeopardy protection against a second trial in a case where the "same evidence" definition of "same offense" would not. *See Brown v. Ohio*, 432 U.S. 161, 166 n. 6, 97 S.Ct. 2221, 2226 n. 6, 53 L.Ed.2d 187 (1977). In *Ashe* a group of poker players were robbed during the course of their game. The defendant was tried and acquitted on a charge of robbing one of the players. Six weeks later he was tried again on a charge of robbing another player and was convicted. The Supreme Court reversed the conviction on the basis of the Double Jeopardy Clause. After scrutinizing the record in the first trial, the Court determined that acquittal in that case had to have been grounded on a finding by the jury that defendant was not at the scene of the crime when it occurred. The issue whether he was at the scene, having been determined by the jury verdict in the defendant's favor, could not, in accordance with the principle of collateral estoppel, be litigated again between the same parties in any future law suit. Thus, since proof of the defendant's presence at the scene was essential to the case against him in the second prosecution, the conviction could not be sustained.

A defendant who argues that *Ashe* is applicable to his case carries the burden of establishing that the issue he seeks to foreclose from consideration in the second case was "necessarily" resolved in his favor in the prior proceeding. *United States v. Seijo*, 537 F.2d 694, 697 (2d Cir. 1976), *cert. denied*, 429 U.S. 1043, 97 S.Ct. 745, 50 L.Ed.2d 756 (1977). "The burden is particularly onerous where the acquittal in the first trial involves the crime of conspiracy." *United States v. Clark*, 613 F.2d 391, 400 (2d Cir. 1979). The court, in determining what issues were necessarily resolved in the first trial, should inquire "whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." *Ashe v. Swenson, supra*, 397 U.S. at

444, 90 S.Ct. at 1394. The court's inquiry should be practical, examining "the record of [the] prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter." *Id.*

In light of these principles, we confront two questions: what did the jury resolve in the first trial and what bearing the resolution has on the judgment in the second trial? *United States v. Clark, supra*, 613 F.2d at 400.

It follows from our holding above that the Government was collaterally estopped from introducing that evidence in the second trial which concerned Castro's membership in a conspiracy to distribute illegal drugs. Specifically, the evidence of meetings beginning on September 13, 1977, through, and including September 26, 1977 should not have been used as part of the Government's case. Those facts, essential to a conspiracy conviction in the second trial, were determined favorably by the jury in its verdict of acquittal on the conspiracy count. Therefore, the Government was constitutionally foreclosed from relitigating the conspiracy issue in the second trial. Accordingly, we reverse the judgment of conviction on that count.

An additional question is whether the Government was estopped from offering at the second trial proof of the substantive count of illegal distribution on September 29, 1977. Having examined the record in the first trial, we concluded that the *Ashe* rule is inapplicable. The issue of the September 29, 1977 distribution was not actually litigated and therefore not decided in the defendant's favor in the first trial or, stated in another way, the substantive distribution issue decided in his favor at the first trial was not at issue in the second trial. In the first trial, there was no evidence presented to the jury concerning the activities of Ramos, Agent Menendez, and Agent Amador in Chicago from September 26, 1977 until October 1, 1977 when the agents and Ramos began planning for the second sale of heroin. Thus, the question of Castro's culpability as an aider and abettor

for the September 29, 1977 sale was never put to the first jury. Therefore, *Ashe* did not bar the Government from prosecuting Castro in the second trial for the distribution of heroin on September 29, 1977.[5] Having no *Ashe* roadblocks to contend with, the Government maintains that the judgment on the substantive count in the second trial should be affirmed. It is the Government's position that, absent the conspiracy evidence which we stated should have been excluded by the trial court, there is still sufficient evidence in the record to support the jury's finding of guilt. In his brief, defendant maintains that had the lower court properly applied the doctrine of collateral estoppel, thereby excluding the conspiracy evidence, the remaining evidence would not have been sufficient to send the case to the jury. At oral argument, however, defendant suggested that the substantive count should be reversed and remanded for a new trial. We agree. The difficulty with accepting the Government's position is that the trial court did not instruct the jury that if they found no conspiracy, they should not consider the conspiracy evidence in resolving the substantive count. Thus, there is no basis for determining what evidence the jury relied upon in reaching its guilty verdict on the substantive count. We hold that the Government is entitled to retry Castro on that count.

Accordingly, we reverse and remand count two for further proceedings.

FAIRCHILD, Chief Judge, concurring.

I concur in the decision, but reach it by a somewhat different analysis.

I agree that review of the evidence of both trials demonstrates factually that Count One of Indictment 987 and Count One of Indictment 1021 charged the same conspiracy. Accordingly, the trial of Count One of No. 1021 violated the Fifth Amend-

ment and the resulting conviction is void. There is no need to rely on the doctrine of collateral estoppel. The conviction of conspiracy at the second trial would have been void even if there had been a conviction of conspiracy at the first trial.[1]

It seems to me, however, that defendant is also correct in arguing that Count One of No. 1021 should have been dismissed on double jeopardy grounds before trial. The court's opinion states that a defendant claiming double jeopardy in a second prosecution for conspiracy bears the burden of establishing that the prosecutions are for the same offense in law and in fact. I agree that this burden lies initially with the defendant, but consider that a sufficient showing by the defendant shifts the burden to the State. The Court of Appeals for the Third Circuit has held that "when a defendant makes a non-frivolous showing that an indictment charges the same offense as that for which he was formerly placed in jeopardy, the burden of establishing separate crimes—in this case separate conspiracies—is on the government." *United States v. Inmon*, 568 F.2d 326, 331–32 (3d Cir. 1977). *Accord, United States v. Mallah*, 503 F.2d 971 (2d Cir. 1974). Two courts of appeal have held that this burden is on the defendant, but their opinions do not indicate whether they meant only an initial burden or a burden throughout the proceeding. *United States v. Marable*, 578 F.2d 151, 153 (5th Cir. 1978); *United States v. O'Dell*, 462 F.2d 224 (6th Cir. 1972). I would find that defendant met his burden, but the government failed to meet its resulting burden of showing separate conspiracies and that the district court should have dismissed Count One of No. 1021 on double jeopardy grounds before trial.

Castro had already stood trial on an indictment charging that he and Ramos had conspired to distribute heroin, and that the conspiracy had begun in September, 1977

---

5. There is no argument made by Castro that the jury's verdict of acquittal on the conspiracy count necessarily encompassed a determination in his favor of facts essential to conviction of the aider and abettor count based on the September 29, 1977 sale.

1. The government's brief at page 35 acknowledged that Count One of No. 1021 would be barred on double jeopardy grounds if this court were to determine that the two conspiracies charged were actually only one conspiracy.

and continued to February 2, 1978. When brought to trial on No. 1021, he was facing a charge that he and Ramos had conspired to distribute heroin, and that the conspiracy had begun in the summer of 1977 and continued to a date in November, 1977.

The two conspiracy counts differed in that two additional conspirators were named in No. 987, different from the two additional conspirators named in No. 1021, and some of the overt acts alleged were different. Nevertheless, there was nothing in No. 1021 which could have prevented the government from a second submission of the proof offered at the first trial, to prove the conspiracy count of No. 987.

Given the identity of two conspirators, the identity of the object of the conspiracy, the substantial identity of the time over which the conspiracy was alleged to have continued, and there being nothing in No. 1021 which limited the government to a different conspiracy from that which it attempted to prove to the first trial, it seems to me that the conspiracy count of No. 1021 should have been dismissed as a violation of the Fifth Amendment. If the government wished to claim a different conspiracy, it should have obtained a new indictment which would have excluded the conspiracy claimed in No. 987, and attempted to be proved.

Application of the doctrine of collateral estoppel is appropriate as to Count Two of No. 1021 and presents a close question. It is clear that Castro could be found guilty of the delivery of heroin only on the theory that he aided and abetted Ramos, Alejo, and Acapulco Joe in the September 29 sale. There is little on which to base a finding of aiding and abetting not also encompassed within the alleged existence of a conspiracy between Castro and Ramos at and before the time of this sale; the first jury found that such conspiracy did not exist. It is with some doubt that I concur in the decision permitting a new trial on Count Two. At that new trial on the substantive drug delivery count, the government will at least be precluded from using evidence of the alleged conspiracy of which Castro has been acquitted to show that Castro aided and abetted in the drug delivery on September 29.