**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Jeffery SERGIO, Defendant–Appellant.**

**No. 90–1942.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 15, 1991.

Decided June 11, 1991.

Andrew B. Baker, Jr., Asst. U.S. Atty., Office of the U.S. Atty., Dyer, Ind. and Rick L. Jancha, Asst. U.S. Atty., Office of the U.S. Atty., South Bend, Ind., for plaintiff-appellee.

Margaret L. Paris, Robert M. Stephenson, Cotsirilos, Stephenson, Tighe & Streicker, Chicago, Ill., and James F. Korpal, South Bend, Ind., for defendant-appellant.

Before FLAUM, EASTERBROOK and MANION, Circuit Judges.

FLAUM, Circuit Judge.

Drug rehabilitation centers often work wonders helping addicts cope with drug dependency. They fare less well combating avarice. In 1986, Scott Gallagher met Steven Birnberg at a rehab center in Wisconsin, where both agreed that there was money to be made selling cocaine if only they could refrain from snorting the profits up their nostrils. So they made a "secret pact" to help each other through treatment and to go into the cocaine business together afterward. Group support is usually a critical element in such treatment programs, and it worked for Gallagher and Birnberg. The two launched a drug distri-

bution operation in South Bend, Indiana, the following summer.

Like any entrepreneur, Gallagher's first task was to obtain financing. To that end, he approached people whom he knew had dealt cocaine in the past to see if they would be interested in providing start-up funds. Many of them, including the appellant, Jeff Sergio, were interested, and put up money to finance Gallagher's first purchase of cocaine from Birnberg, who arranged to have four ounces of cocaine shipped to Gallagher from California. Sergio took a quarter ounce of this first shipment, and purchased half ounces from the next two four-ounce shipments Gallagher received.

At that point Gallagher brought in Andrew Cordischi to be his partner in the business. The two began receiving regular shipments of cocaine, usually four ounces but occasionally more, from Birnberg. By the time Gallagher brought Cordischi in as a partner, Sergio was buying an ounce of cocaine from each shipment. Gallagher routinely fronted cocaine to his distributors—giving them the cocaine on credit to be repaid from the proceeds of their sales—a practice that ultimately created problems for him when he was unable to collect on debts owed him. Typically, Gallagher informed Sergio when the shipment was due and Sergio would show up on that day to get his cocaine; on several occasions Sergio was present while Gallagher divvied up the shipment. Birnberg made a total of fifteen shipments of cocaine to Gallagher between July 1987 and the summer of 1988.

Despite the success of the business, or perhaps because of it, Gallagher had difficulty staying on the wagon. His performance suffered, and Birnberg cut him off on several occasions. During these periods, Cordischi ran the operation himself, supplying Gallagher's network of distributors as well as his own. At trial, Cordischi estimated that he received, at a minimum, 40 ounces of cocaine directly from Birnberg and that Sergio purchased about a quarter of the cocaine he received from Birnberg. In November 1987, Birnberg flew to South Bend to talk with Gallagher about his problems; while at Gallagher's house, he met Sergio, and the two spoke on the phone several times. On one occasion, Birnberg suggested to Sergio that if he bought from Birnberg directly they could both eliminate the headache of dealing with Gallagher. Sergio, however, told him that "he didn't want to have any part of it." Sergio remained loyal to Gallagher even when Gallagher was on the outs with Birnberg and Cordischi; he supplied Gallagher with cocaine on several occasions during the period Gallagher and Birnberg were estranged. When Birnberg resumed selling to Gallagher, Sergio purchased cocaine from both Gallagher and Cordischi, although Cordischi was unaware that Sergio had resumed buying from Gallagher. In April 1988, Cordischi cut off one customer, Chris Riewe, who had continued to buy from Gallagher after he and Cordischi had split. As Gallagher's problems worsened, he and Sergio worked even more closely together. As Gallagher testified:

> There were times when the two of us being cocaine dealers, and also knowing people in the same business, sometimes he was the one that was able to go find the cocaine first, and thus he gave me some cocaine. So, we tried to keep each other in business, especially during the summer of 1988.

Gallagher was arrested by state police in 1988. He was tried in state court and received two concurrent ten-year sentences as the result of his drug trafficking activities. Birnberg, Cordischi, and another associate, Jack Braddell, were indicted together in federal court for conspiring to possess and distribute "large quantities" of cocaine in Indiana, Arkansas, Florida, and elsewhere. They each pleaded guilty. As part of the plea agreement, the parties agreed that Birnberg and Cordischi were responsible for shipping 1,232 grams of cocaine into the South Bend area. Accordingly, the offense levels for Birnberg and Cordischi were calculated to be 26. U.S.S.G. § 2D1.1(c)(9). Birnberg was sentenced to 51 months' incarceration; Cordis-

chi to 30 months.[1] Braddell's offense level of 20 was based on the 224 grams of cocaine he had transported to South Bend for Birnberg; he was sentenced to prison for 27 months.

Sergio, along with Chris Riewe, was charged in a separate indictment with conspiring to possess and distribute "quantities" of cocaine in Indiana and elsewhere. Riewe pleaded guilty, and was sentenced to five years in prison on a pre-guidelines count. Sergio, however, maintained that he had bought cocaine only for his personal use and opted to go to trial. There he received an unwelcome surprise. Gallagher, Cordischi, and Birnberg testified against Sergio, and their testimony indicated that Birnberg had shipped not 1,232 grams of cocaine into South Bend, but at least 100 ounces (almost 3,000 grams), and possibly much more. The jury convicted Sergio, and the district court sentenced him on the basis of the entire quantity of drugs the government had proved Birnberg shipped to Gallagher and Cordischi in South Bend. The district court declined Sergio's request that the court depart downward on the basis of the disparity between Sergio's sentence and those received by Birnberg and Cordischi that would result from application of the guidelines to Sergio's offenses. The court sentenced Sergio to 87 months, the mid-point of the applicable guideline range of 78 to 97 months.[2]

On appeal Sergio does not challenge his conviction. He concedes that the evidence was sufficient to support his conviction for conspiring to possess and distribute the 500 plus grams of cocaine mentioned in his indictment. Nor does he contest the court's finding that Birnberg, Gallagher, and Cordischi sold at least 100 ounces of cocaine in South Bend. What he contests instead is the district court's determination that he was a member of the conspiracy between Birnberg, Gallagher, and Cordischi to sell larger quantities of drugs in South Bend. These three suppliers, he submits, had their own distinct agreement, and he argues that he therefore should not have been held accountable for drugs the trio shipped into South Bend but sold to other dealers.

■■■ The sentencing guidelines require courts to scale the sentence of a defendant convicted of committing a drug offense "to aggregate the amounts of drugs from any acts that 'were part of the same course of conduct or common scheme or plan as the offense of conviction.'" *United States v. Franklin*, 902 F.2d 501 (7th Cir.1990) (quoting U.S.S.G. § 1B1.3(a)(2)); *see also United States v. White*, 888 F.2d 490, 497 (7th Cir.1989). For those convicted of conspiring to violate the drug laws, this provision makes them criminally responsible for "the total quantity of drugs the conspiracy can reasonably be estimated to have dealt in." *United States v. Townsend*, 924 F.2d 1385, 1389 (7th Cir.1991). A conspiracy to distribute drugs is an agreement to distribute drugs, and under the guidelines a defendant must be sentenced on the basis of all drugs that were distributed pursuant to that agreement, whether or not he was personally responsible for distributing them or knew about their distribution. It is critical therefore to determine the scope of a defendant's agreement; the scope of an agreement determines the scope of a conspiracy, which in turn determines the scope of derivative liability under the guidelines. Compare, for example, Application Note 1a for § 1B1.3 (defendant who agrees to unload a boat load of marijuana is accountable for total quantity of marijuana on board) with Application Note 1e (defendant who agrees to unload a boat load of marijuana is *not* accountable for quanti-

---

1. The minimum guideline range for crimes with a base offense level of 26 is 63–78 months. The record does not reveal why Birnberg and Cordischi received sentences below the minimum applicable guideline range.

2. Sergio's base offense level was 28 (*see* § 2D1.1(c)(8)); his criminal history category was I. The district court sentenced him to the midpoint of the applicable range because the government proved that the conspiracy involved at least 2800 grams of cocaine, which falls midway between the applicable quantity range for base offense level 28.

ties shipped on other boats by those who hired him).

■ Unfortunately for Sergio, there is abundant evidence to support the district court's finding that he joined Gallagher, Cordischi, and Birnberg's conspiracy to distribute drugs in South Bend on an open-ended basis. "To prove that a defendant was a member of a conspiracy the government must present sufficient evidence to demonstrate that the defendant knew of the conspiracy and that he intended to join and associate himself with its criminal design and purpose." *United States v. Auerbach*, 913 F.2d 407, 414–15 (7th Cir.1990). Sergio knew that Gallagher, Cordischi, and Birnberg were distributing cocaine in South Bend, but maintains that he never agreed to join their conspiracy. He was, he insists, nothing more than a disinterested purchaser of drugs from the conspiracy. When a dealer buys for resale from another dealer, however, it is reasonable to infer "a limited agreement to distribute" between the two dealers. *Townsend*, 924 F.2d at 1392; *United States v. Roth*, 777 F.2d 1200, 1205 (7th Cir.1985) (middleman who sells drugs to user is a conspirator with the drug supplier). Sergio baldly proclaims that there was no evidence that he was a dealer, but to accept that claim we would have to completely ignore the testimony of Gallagher and Cordischi, as well as that of John Wright and Chris Riewe, who were also buying cocaine from Gallagher and Cordischi to resell.

Sergio's continuous involvement with the conspiracy also belies his assertion that he was merely a customer. *See Auerbach*, 913 F.2d at 415 (defendant's ongoing relationship with drug supplier held probative of membership in conspiracy). Gallagher testified that Sergio was one of a group of "movers and shakers" in the cocaine business in South Bend whom he first approached with his business plan; according to Gallagher, he "talked to them personally and told them what [his] idea was and what [he] wanted to do." Part of Birnberg's plan was to distribute cocaine in relatively large quantities to others to deal on the street "so we could keep our exposure down." Jeff Sergio became one of Gallagher's, and later Cordischi's, distributors because he, like others, had to finance his cocaine habit. Sergio put up money toward Birnberg and Gallagher's first shipment of drugs into South Bend, and, according to Gallagher and Cordischi, received significant portions of every subsequent shipment they received from Birnberg. Sergio also served frequently as the "Candy Man" for Gallagher and Cordischi at parties. As Gallagher described the position, the Candy Man "goes to the parties and instead of having one of us who were the upper people in the organization exposed to selling cocaine in quarter grams, half grams, normally what you see being bought at parties," the Candy Man would handle such sales, dispensing prepackaged quantities of cocaine from the "Candy Bag." As they did with other dealers, Gallagher and Cordischi fronted drugs to Sergio, a fact that attests to the trust and cooperation that characterized his relationship with them. *Townsend*, 924 F.2d at 1406; *United States v. Anderson*, 896 F.2d 1076, 1080 (7th Cir.1990). Gallagher testified that fronting cocaine to his dealers was "never a problem usually because they all knew they could all stay within a certain boundary...." He also added that knowing Sergio as well as he did, he had fronted Sergio up to two ounces of cocaine at a time, a quantity worth over $3,000 at the prices Birnberg was charging his distributors.

It is also fair to infer that Sergio had at least a rough idea of the quantity of drugs Gallagher and Cordischi were distributing in South Bend. Sergio was often present when Gallagher or Cordischi divided the shipment into smaller packages to pass on to other distributors like himself; Cordischi even testified that he obtained the scale he used to break down the shipments from Sergio. Sergio also knew many of the other dealers who were buying from Gallagher and Cordischi, a fact that indicates not that he joined the conspiracy because he knew a lot of its members but that he knew the scope of the enterprise with which he had associated himself. Gallagher testified that he, Cordischi, and Sergio were members of a group that "hung out

together" and that included the other dealers to whom he and Cordischi were distributing cocaine. In Gallagher's words, "we were all in it together. So, everybody knew everybody was in it. Everybody that was in it knew who was in it from the beginning." In answer to the question, "In what?", Gallagher responded: "In the organization, in the cocaine business." In his statement to the Probation Office, included in the presentence report, Sergio stated that he believed there "were at least 60 people" buying drugs from Gallagher and Cordischi; their testimony suggested that the number was smaller, but the relevant point is that Sergio had a fair idea of the scope of the conspiracy because he knew that Gallagher and Cordischi were distributing large quantities of cocaine through a network of distributors.

Sergio, however, was not just another distributor. He was, according to Gallagher, a "mainstay" of his "operation," his "main distributor." Sergio's first purchases from Gallagher were relatively small, but Gallagher testified that after Cordischi became his partner, Sergio's purchases increased to about an ounce from each shipment because Cordischi's promotion had "open[ed] up his distributorship" since Cordischi was no longer selling on the street. Sergio's expansion suggests a much closer connection between his sales activity and that of Gallagher and Cordischi than he is willing to admit. When Gallagher and Cordischi had a falling out in November 1987, Cordischi began receiving shipments from Birnberg directly. Sergio admitted in a statement to the Probation Office that at that time he started buying cocaine from Cordischi as well as Gallagher; Cordischi testified that Sergio began purchasing approximately an ounce of cocaine from every shipment Cordischi received from Birnberg and became his second largest customer.

Birnberg also knew Sergio. He spoke with Sergio many times over the phone, met him in person on at least one occasion, and thought enough of Sergio to offer to sell cocaine to him directly. Sergio maintains that he declined the offer because he wanted no part of the conspiracy but in light of his substantial involvement with the conspiracy up to that point it would not be unreasonable to infer that he declined Birnberg's offer simply because he did not wish to assume a larger role or out of fidelity to Gallagher; as one DEA agent testified at trial, it is considered a serious breach of etiquette among drug dealers to circumvent your supplier. And on another occasion, when Birnberg came to South Bend to collect a debt from Gallagher and to try and straighten him out, Gallagher testified that he called on his distributors to bail him out: "I went to the people that were distributing for me and informed them that another package will be coming in and "we needed to get money rounded up as quick as possible so I would be able to cover the money that I owed [Birnberg] plus money for the next batch." Sergio contributed $500 and a quarter ounce of cocaine to this relief effort.

There may be some question as to whether Gallagher's conspiracy with Cordischi and Birnberg survived until the summer of 1988, but that question is of little consequence for Sergio. He continued to buy drugs from Gallagher after Birnberg and Cordischi cut Gallagher out of the distribution chain, even though by doing so he risked being cut off himself. According to Gallagher, during the summer of 1988, he was buying cocaine from many sources other than Birnberg and Cordischi. He coordinated his cocaine purchases closely with Sergio, determining how much cocaine Sergio needed before he went to his sources to procure it. Sergio also sold drugs to Gallagher on several occasions during the period when Birnberg had cut him off. In Gallagher's words, he and Sergio "tried to keep each other in business, especially during the summer of 1988." Sergio's loyalty to Gallagher further discredits his assertion that he was merely a disinterested purchaser of cocaine. He was clearly committed to helping Gallagher stay afloat.

The principal evidence Sergio offers to support his assertion that he did not conspire with Birnberg, Cordischi, and Gallagher is the government's decision to charge Sergio in a separate indictment. Where

the government charged Birnberg and Cordischi with conspiring to possess and distribute "large" quantities of cocaine in "Indiana, Arkansas, Florida, and elsewhere," he observes, it charged him only with conspiring to possess and distribute "quantities" of cocaine in "Indiana and elsewhere." The differences between the two indictments show, he insists, that the scope of Sergio's activities was more limited than that of his suppliers.

We cannot say that the decision to indict Sergio separately constitutes a concession that Sergio was not a member of the suppliers' conspiracy. It seems more likely that Sergio was indicted later simply because the government did not have enough evidence to indict him until the suppliers began providing information. Nor do we consider the minimal linguistic variation between the indictments to be as telling as Sergio suggests. The government proved at trial that Sergio conspired with Gallagher, Cordischi, and Birnberg; its case would have been no different had Sergio been charged in the same indictment with Birnberg and Cordischi. At any rate, the district court sentenced Sergio only on the basis of the 100 ounces of cocaine Birnberg shipped to Gallagher and Cordischi in South Bend; it did not sentence him on the basis of his coconspirators' drug-related activities elsewhere, or even on the basis of drugs Gallagher obtained in South Bend from sources other than Birnberg and Cordischi. It is therefore unnecessary to consider whether Sergio could fairly be held to have conspired to distribute drugs elsewhere.

We are not insensitive to the possibility that prosecutors may be tempted to expand conspiracy liability by bringing in new evidence under the less onerous burden of proof that prevails at sentencing. *See United States v. Ebbole*, 917 F.2d 1495, 1501–02 (7th Cir.1990). This does not strike us as such a case. The government did not wait to establish that Sergio conspired with Birnberg, Gallagher, and Cordischi until sentencing; it presented that evidence at trial to satisfy its burden to prove that Sergio conspired to distribute cocaine as charged in the indictment, and

its evidence was sufficient for a jury to conclude that it had proved beyond a reasonable doubt that he did so.

■ Sergio also maintains that the district court erred by refusing to reduce his base offense level by two levels to reflect his minor role in the conspiracy. U.S.S.G. § 3B1.2(b). Sergio never requested that reduction during sentencing, however, and we agree with the government that he has therefore waived this issue. Sergio maintains that he implicitly requested the reduction when he appealed to the district court to consider the relatively small portion of the cocaine that he personally handled, but that appeal was part of the defendant's general plea for the court to exercise "any discretion" left to it by the guidelines, a fact that actually reinforces our conclusion that he did not believe there was a specific guideline provision under which the court could reduce his sentence. A defendant cannot claim, merely by reciting to the court a list of mitigating facts, that he has properly invoked any guideline provision to which those facts might be relevant.

■ Even were we to credit Sergio's claim that he raised this issue, we could not find the district court's implicit conclusion that Sergio was not a minor participant in the conspiracy to be clearly erroneous. Indeed, we agree with it. Application Note 3 to this guideline defines a "minor" participant as "any participant who is less culpable than most other participants...." Sergio claims that the provision applies to him because he was less culpable than Birnberg, Gallagher, and Cordischi. That much is undoubtedly true, but he neglects to consider all the other dealers who also conspired with this trio. As to them, Sergio was as culpable, if not more so (recall that Gallagher identified Sergio as his principal distributor, and Cordischi identified him as his second largest customer).

Sergio's dealings with the conspiracy suggest precisely the sort of cooperative relationship we held to be a necessary predicate to conspiracy liability in *Townsend*, 924 F.2d at 1394–95. Given these facts, it was anything but unreasonable for the dis-

trict judge to conclude that Sergio agreed to work with Gallagher, Cordischi, and Birnberg to distribute drugs in South Bend. That being the case, the guidelines require that he be held accountable, at a minimum, for the full complement of drugs their operation distributed in South Bend. The sentence of the district court is therefore

AFFIRMED.