UNITED STATES of America,
Plaintiff–Appellee,

v.

Lester DORTCH, a/k/a "Lightning," Wilhelm Suess, a/k/a "Wild Bill," and Floyd Dortch, Defendants–Appellants.

Nos. 92–1418, 92–1452 and 92–1453.

United States Court of Appeals,
Seventh Circuit.

Argued April 5, 1993.

Decided Sept. 22, 1993.

Ralph M. Friederich, Office of the U.S. Atty., Crim. Div., Fairview Heights, IL (argued), for plaintiff-appellee.

Curtis L. Blood, Collinsville, IL (argued), for Lester Dortch.

William E. Taylor (argued), Taylor & Associates, St. Louis, MO, for Wilhelm Suess.

Terence Niehoff, St. Louis, MO (argued), for Floyd Dortch.

Before FLAUM and KANNE, Circuit Judges, and ENGEL, Senior Circuit Judge.*

KANNE, Circuit Judge.

In this case, three defendants raise separate challenges to their convictions for drug conspiracy. We find all of the defendants' arguments meritless and affirm each of their convictions.

## I. Facts

On June 20, 1991, a federal grand jury sitting in East St. Louis, Illinois, indicted Lester Dortch, Charles "Boyce" Vaughn ("Chuck Vaughn"), Floyd Dortch, Don Davis, Mike Billingsley, Wilhelm Suess, Troy Papproth, David Peters, and Thomas Solomon for conspiring to distribute in excess of five kilograms of cocaine in violation of 21 U.S.C. §§ 841(a)(1) & 846. The following facts were adduced during a lengthy trial, after which the jury returned a verdict against Lester Dortch, Floyd Dortch and Wilhelm Suess.

The Windtramps Motorcycle Club ("Windtramps") was a group of motorcycle enthusiasts who began dealing drugs and weapons. By the late–1980s, the group was dealing cocaine, methamphetamines, marijuana, guns and explosives. The Windtramps' President, Tommie Taylor, and Sergeant-at-Arms, John Davis, initially formed the conspiracy to distribute cocaine among the club's members. Most of the drugs were dealt from a house adjacent to the Windtramps' clubhouse in East St. Louis. At the start, Taylor and John Davis obtained cocaine from many sources. By 1989, the Windtramps' principal supplier was a man named Jesse Armer.

However, Armer became deeply indebted to his cocaine source—a man named Lester Dortch. As a result, James Burkett, Armer's neighbor, became the Windtramps' main supplier, using Lester Dortch as his source. From early 1989 to early 1990, Lester supplied Burkett with approximately two to three ounces a week. Burkett sold all his cocaine to the Windtramps and formed a partnership with John Davis and Tommie Taylor ("the Windtramps partnership"), in the fall of 1989, to distribute cocaine to the Windtramps—even though Burkett was not a member of the Windtramps.

Burkett's source, Lester Dortch, had been involved with cocaine distribution prior to his involvement with Armer and Burkett. In January 1988, Lester moved from Chicago to East St. Louis to work for Anthony Davis—a cocaine dealer who had recently expanded his drug operations from Chicago to East St. Louis. Lester worked for Anthony Davis until shortly after he began his dealings with Armer and Burkett. At that point, in April 1989, Lester stopped working for Anthony Davis and became Davis' customer. In October 1989, Lester formed a cocaine distributing partnership with Chuck Vaughn. Lester and Chuck had various sources of cocaine, including Lester's father Floyd Dortch, who lived in Chicago. Lester and Chuck sold most of their cocaine to the Windtramps partnership, which in turn sold it to Windtramps members.

In late 1989 or early 1990, the Windtramps partnership discovered that Floyd Dortch was Lester's cocaine source and began, on occasion, to buy directly from Floyd. On their first trip to Chicago, Burkett and Taylor bought nine ounces of cocaine. Floyd permitted the men to take delivery despite the fact that they were $600 short; the men were to make good on their debt later. Burkett and John Davis purchased fourteen ounces of cocaine from Floyd in early 1990. Soon after, Burkett and Davis returned to Chicago and purchased another four ounces from Floyd.

---

* The Honorable Albert J. Engel, Senior Circuit Judge for the Sixth Circuit, is sitting by designation.

In late 1988, Wilhelm Suess was a probationary member of the Windtramps who quickly became involved in the club's drug business. Suess bought cocaine from the Windtramps partnership, mixed it with "cutting" compounds and resold it to Windtramps members and others. The Windtramps partnership often "fronted" cocaine to Suess, allowing him to pay for it after he took delivery and presumably with the proceeds from subsequent sales. On at least one occasion, Suess was left in charge of the Windtramps' drug business when Davis, Burkett and Taylor left East St. Louis to procure more cocaine.

On April 19, 1990, as a result of undercover police work, the majority of the Windtramps members were arrested in connection with the drug conspiracy. On April 20, 1990, several key members of the Anthony Davis drug organization were also arrested. At that time, Lester Dortch, Floyd Dortch and Chuck Vaughn were not arrested because the Illinois investigators were unaware of their role in the conspiracy. Subsequently, several members of the Windtramps, including core conspirators John Davis and James Burkett, cooperated with the government, and the information they provided led to the arrest, indictment and conviction of Lester, Floyd and Chuck.

This appeal requires us to examine the convictions of Lester Dortch, Floyd Dortch and Wilhelm Suess. Each defendant raises different issues which we will address individually. Additional facts are supplied as necessary.

## II. Lester Dortch: Double Jeopardy

█ Lester Dortch's sole challenge to his conviction is a double jeopardy claim. Lester argues that his prosecution in this case is barred because he pled guilty to the same offense in September 1991. To understand Lester's claim, the following summary of additional pertinent facts is necessary.

On January 30, 1991, Lester and three other named individuals were indicted by a federal grand jury in the Eastern District of Missouri (the "Missouri case"). The six count indictment alleged, *inter alia,* that the four men conspired to distribute cocaine from "on or about the 24th day of July, 1990 through the 30th day of July, 1990," in violation of 21 U.S.C. §§ 841(a)(1) & 846. The remaining counts charged substantive violations of 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1). The Missouri indictment specifically charged the following four overt acts: (1) Chuck Vaughn leased Apartment D at 4066 Westminster Place, St. Louis, Missouri; (2) on July 30, 1990, Chuck Vaughn stored approximately two pounds of cocaine in a bedroom closet at 4066 Westminster Place, Apartment D; (3) on July 24, 25, & 26, 1990, Michael Orr and Lester Dortch together distributed cocaine to an individual on the National Food Store parking lot, 4171 Lindell, St. Louis, Missouri; and (4) on July 30, 1990, Charles Ramey exited Apartment D, 4066 Westminster Place in possession of approximately three ounces of cocaine.

On September 13, 1991, Lester pled guilty to the conspiracy count and to one count of distribution; the government dismissed two other distribution counts. In Lester's view, his guilty plea in the Missouri case should have barred his prosecution in this case because the indictments in each charged the same conspiracy to distribute cocaine. This is not the first time Lester has raised this argument.

Prior to trial, Lester moved to dismiss the Illinois indictment, relying on the Double Jeopardy clause of the Constitution. The trial court held a hearing. Lester offered documentary evidence which he believed demonstrated that the Missouri and Illinois conspiracies were really one and the same. In response, the government introduced testimony from two government agents which suggested that two separate conspiracies existed. The district judge agreed with the government's position and denied Lester's motion to dismiss.

Lester filed an interlocutory appeal with this court pursuant to *Abney v. United States,* 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977).[1] However, the district

---

1. In *Abney,* the Supreme Court held that because the Double Jeopardy Clause protected a defendant from a second trial, a district court's refusal to dismiss an indictment was immediately ap-

court found Lester's claim frivolous, and we denied Lester's request for a stay pending appeal pursuant to *United States v. Cannon,* 715 F.2d 1228, 1231 (7th Cir.1983), *cert. denied,* 464 U.S. 1045, 104 S.Ct. 716, 79 L.Ed.2d 178 (1984).[2] Lester renewed his double jeopardy claim before the trial court in two subsequent motions for acquittal, arguing that the government's evidence at trial had proved the Missouri conspiracy to which he had already pled guilty. The district court denied both motions.

Lester's motions for acquittal have preserved the double jeopardy issue for our review. Before we address the merits of Lester's claim, however, we must first define the scope of our inquiry and determine which party bears the burden of proof.

■ When a defendant files an interlocutory appeal of the trial court's denial of a pre-trial motion to dismiss on double jeopardy grounds, the question presented to us is whether the trial court's decision was erroneous. *See United States v. Chiattello,* 804 F.2d 415, 417 (7th Cir.1986); *United States v. West,* 670 F.2d 675, 681 (7th Cir.), *cert. denied,* 457 U.S. 1139, 102 S.Ct. 2972, 73 L.Ed.2d 1359 (1982). That is not the same question before us when we are faced with a double jeopardy challenge after a trial has been held. Once there has been a trial, our role is to review "the merits of the double jeopardy claim." *Chiattello,* 804 F.2d at 417. Moreover, our review of the merits, in light of the trial record and other relevant evidence, is *de novo.*

According to Lester, the following passage accurately states the burden of proof on this issue:

> the defendant bears the burden of making a prima facie showing that the two indictments cover the same offense, and thereafter the burden shifts to the government to demonstrate that it has not twice prosecuted the defendant for the same conspiracy.

*United States v. Thornton,* 972 F.2d 764, 767 (7th Cir.1992). Lester cites several cases to

support his position. *See United States v. Dempsey,* 806 F.2d 766, 767 (7th Cir.1986), *cert. denied,* 481 U.S. 1014, 107 S.Ct. 1889, 95 L.Ed.2d 497 (1987). *See also United States v. Booth,* 673 F.2d 27, 30–31 (1st Cir.), *cert. denied,* 456 U.S. 978, 102 S.Ct. 2245, 72 L.Ed.2d 853 (1982); *United States v. Inmon,* 568 F.2d 326, 329–32 (3d Cir.1977); *United States v. McHan,* 966 F.2d 134, 138 (4th Cir.1992); *United States v. Stricklin,* 591 F.2d 1112, 1118 (5th Cir.), *cert. denied,* 444 U.S. 963, 100 S.Ct. 449, 62 L.Ed.2d 375 (1979); *In re Grand Jury Proceedings,* 797 F.2d 1377, 1380 (6th Cir.1986), *cert. denied,* 479 U.S. 1031, 107 S.Ct. 876, 93 L.Ed.2d 831 (1987); *United States v. Tercero,* 580 F.2d 312, 315 n. 12 (8th Cir.1978); *United States v. Bendis,* 681 F.2d 561, 564 (9th Cir.1981), *cert. denied,* 459 U.S. 973, 103 S.Ct. 306, 74 L.Ed.2d 286 (1982); *United States v. Benefield,* 874 F.2d 1503, 1505 (11th Cir.1989).

■ The foregoing quote describes the burden of proof in pre-trial double jeopardy review cases before the court on interlocutory appeal. We do not believe that the burden is the same in cases, like Lester's, which involve post-trial double jeopardy review. We have consistently held that the defendant alone bears the burden in post-trial double jeopardy review cases. *See Chiattello,* 804 F.2d at 418; *West,* 670 F.2d at 681; *United States v. Castro,* 629 F.2d 456, 461 (7th Cir.1980). *See also United States v. O'Dell,* 462 F.2d 224, 226–27 n. 2 (6th Cir. 1972); *United States v. Bendis,* 681 F.2d 561, 564 (9th Cir.1981), *cert. denied,* 459 U.S. 973, 103 S.Ct. 306, 74 L.Ed.2d 286 (1982); *Reid v. United States,* 177 F.2d 743, 745 (5th Cir. 1949).

We have not shifted the burden to the government at the post-trial review stage for good reason. The burden shifting standard developed because of concerns specific to the pre-trial stage:

> The impracticality of placing the burden of persuasion on the defendant ... is obvious in light of his lack of access to the proof on

pealable at the pre-trial stage. 431 U.S. at 662, 97 S.Ct. at 2042.

**2.** In *Cannon,* we held that if the district court concluded that a defendant's motion to dismiss

an indictment was frivolous, the district court retained jurisdiction and appellate review followed later. 715 F.2d at 1231.

which the government proposes to rely and his inability to offer immunity to witnesses.... Where a prior indictment resulted in a guilty plea or was dismissed, so that there is no record of the evidence supporting the prior indictment, the defendant is even further handicapped. The government is clearly in a better position to show that the crime charged in the present indictment is not the same as the one charged in the previous indictment than the defendant is to show that the crimes are the same.

United States v. Stricklin, 591 F.2d 1112, 1118 (5th Cir.), cert. denied, 444 U.S. 963, 100 S.Ct. 449, 62 L.Ed.2d 375 (1979). This concern at the pre-trial stage about the defendant's access to information disappears once the second trial has been concluded. At that point, both the government and defendant have equal access to the record, and thus presumably an equal opportunity to argue that the evidence at trial supports each one's theory on the double jeopardy issue.[3]

Therefore, we hold that at the post-trial stage the defendant alone bears the burden of proving that he or she has been charged with the same offense twice. With these preliminary matters in mind, we turn to the merits of Lester's double jeopardy claim.

■■■ The double jeopardy clause prohibits an individual from being prosecuted for two separate conspiracies if only one conspiracy existed. Braverman v. United States, 317 U.S. 49, 53, 63 S.Ct. 99, 101, 87 L.Ed. 23 (1942); Thornton, 972 F.2d at 766; Dempsey, 806 F.2d at 767; Chiattello, 804 F.2d at 418; West, 670 F.2d at 681; Castro, 629 F.2d at 461; United States v. Palermo, 410 F.2d 468, 470 (7th Cir.1969). Because a conspiracy is essentially an agreement, "a determination of whether the Government can prosecute on more than one conspiracy rests on whether there exists more than one agreement." Chiattello, 804 F.2d at 418.

■■■ We have recognized that the so-called "same evidence" test is not the appropriate way to determine whether the Double Jeop-

ardy Clause has been violated in a conspiracy case. Rather,

[t]o determine whether a conspiracy has been subdivided arbitrarily, resulting in multiple indictments for a single illegal agreement, courts [ ] will look to both the indictments and the evidence and consider such factors as whether the conspiracies involve the same time period, alleged co-conspirators and places, overt acts, and whether the two conspiracies depend on each other for success. Where several of these factors are present, the conclusion follows that the alleged illegal combinations are not separate and distinct offenses.

Castro, 629 F.2d at 461. In addition, we have also considered whether the indictments charged the same statutory offenses. United States v. Powell, 894 F.2d 895, 898 (7th Cir.), cert. denied, 495 U.S. 939, 110 S.Ct. 2189, 109 L.Ed.2d 517 (1990). Finally, in determining whether there was one or more conspiracies, "we cannot ignore case law outside the double jeopardy context that defines the scope of the conspiracy." Thornton, 972 F.2d at 769.

According to Lester, the government's evidence in the Illinois trial proved that there was a single conspiracy between those individuals indicted in Illinois and those indicted in Missouri, the objective of which was to "make money from the sale of cocaine in East St. Louis and nearby areas." Lester further contends that the conspiracy did not end until he and Chuck Vaughn were arrested in July 1990. The government construes the scope of the conspiracy more narrowly, claiming that the goal of the Illinois conspiracy was to distribute cocaine to the Windtramps Motorcycle Club and that that conspiracy ended in April 1990 when almost all the principals were arrested and jailed.

We have reviewed the record in order to determine exactly what the government sought to prove during the Illinois trial. The following summarizes the strongest evidence supporting Lester's argument: (1) Lester

**3.** We note that one circuit has held that the burden of proof shifts to the government even at the post-trial stage. See United States v. Mallah, 503 F.2d 971, 986 (2d Cir.1974), cert. denied, 420 U.S. 995, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975). We believe that case is inconsistent with our existing precedent and decline to follow the Second Circuit.

and Chuck Vaughn participated in both of the conspiracies charged in the Illinois and Missouri indictments; (2) one of the overt acts in the Missouri indictment—the rental of the St. Louis apartment—occurred during the time frame charged in the Illinois indictment; (3) Lester and Chuck had at least one of the same sources of cocaine and one of the same customers after the Illinois conspiracy allegedly ended in April of 1990; (4) the illegal activities in both conspiracies took place within a few miles of each other; and (5) the indictments charged violations of the same statutory provision—21 U.S.C. § 841.

Based on the foregoing, Lester believes that several of the *Castro* factors are present here—co-conspirator overlap, time overlap, location overlap and overt acts overlap— hence "the conclusion follows that the alleged illegal combinations are not separate and distinct offenses." 629 F.2d at 461. We do not find the overlap as extensive as Lester does and accordingly conclude that he has not carried his burden of demonstrating the existence of but a single conspiracy.

First, we do not believe the fact that Lester and Chuck, two out of the twenty-three defendants named in the Illinois indictment, were also charged in the Missouri indictment strongly supports Lester's position.[4] If there were really only one conspiracy among the whole group, we would expect a greater overlap of members. While two common defendants out of four total indictees may strongly suggest a common conspiracy, two out of twenty-three simply does not. *Compare Castro,* 629 F.2d at 460–62 (two core conspirators, out of a total of four charged in both indictments, indicates one agreement); *Powell,* 894 F.2d at 898 (three out of three total conspirators the same in both conspiracy indictments indicates only one agreement) *with Chiattello,* 804 F.2d at 418 (twelve defendants charged in one indictment, forty-one charged in another; three persons charged in both indicates two separate conspiracies).[5]

Second, we do not find the alleged time overlap particularly significant. While some evidence suggests that Lester and Chuck continued their drug business after the arrest of the majority of the Illinois defendants, the dates in the two indictments—January 1987–April 1990 and July 24–30, 1990—do not overlap. In the past, we have found a single conspiracy only when the dates charged in the indictments actually overlapped. *Compare Powell,* 894 F.2d at 898 (second conspiracy completely subsumed in time frame of first conspiracy); *United States v. Cerro,* 775 F.2d 908, 910 (7th Cir. 1985) (five conspiracies charged in one indictment all occurred over the same three year period); *Castro,* 629 F.2d at 462 (three month overlap) *with West,* 670 F.2d at 681 (no double jeopardy found where time frame of indictments did not overlap). Moreover, even when indictment dates have *substantially* overlapped, we have not concluded that a single conspiracy existed. *See Thornton,* 972 F.2d at 767–68 (one conspiracy completed during time frame of the other conspiracy); *Dempsey,* 806 F.2d at 767 (approximately a five-year overlap); *Chiattello,* 804 F.2d at 419 (time frame of one conspiracy completed embraced by the other charged conspiracy).

In addition to the foregoing precedent, other evidence supports our conclusion that the government did not arbitrarily divide the time frame of one conspiracy into two in order to improperly charge two conspiracies. During the Illinois trial, Chuck Vaughn testified that he and Lester stopped dealing cocaine immediately after the members of the Windtramps were arrested. Therefore, it seems possible, if not likely, that Chuck and Lester embarked on a separate conspiracy with other individuals after the arrests of April 1990. The alleged time overlap factor does not significantly strengthen Lester's double jeopardy claim.

Third, the fact that the illegal activities in both conspiracies occurred in nearby locations does not convince us that only one

---

4. We note that Chuck Vaughn pled guilty to both indictments apparently without raising a double jeopardy challenge.

5. We note that our conclusion is supported by *Booth,* in which twenty-four defendants were

charged in one indictment and nineteen were named in a second indictment; ten defendants were common to both. 673 F.2d at 29. The court concluded that "the persons involved in the two conspiracies are substantially different." *Id.*

conspiracy existed. The greater St. Louis area is certainly large enough to be home to more than one conspiracy to distribute cocaine. Moreover, the evidence at trial proved that, at most, only four cocaine sales to Illinois conspirators were made in St. Louis. The overwhelming majority of cocaine transactions occurred in East St. Louis, Illinois, without any apparent connection to Missouri. *See West,* 670 F.2d at 681 (two separate conspiracies found: one in Gary, Indiana and one in Cook County, Illinois). This evidence suggests that the two conspiracies had different methods of dealing—one using direct delivery to customers in East St. Louis, and the other relying on pickup by customers at the National Food Store parking lot in St. Louis. Such evidence does not strongly support a conclusion that only one conspiracy existed.

Fourth, we believe that the fact that both indictments charged violations of the same statute, 21 U.S.C. § 841, is the weakest evidence on which Lester relies. One individual can certainly join more than one conspiracy to distribute drugs. Lester would like us to focus solely on his relationship with Chuck and the agreement between the two men to sell cocaine. While it is likely that Chuck and Lester only had one agreement with each other, that does not prevent them, as a partnership, from joining more than one conspiracy to distribute cocaine in the East St. Louis/St. Louis area. "[T]he guarantee against double jeopardy does not insulate a criminal from punishment for subsequent offenses merely because he chooses to continue committing the same type of crime." *West,* 670 F.2d at 681.

Finally, we address the final *Castro* factor, which Lester understandably minimizes in his brief, but to which we have paid the most attention in the past: whether the two conspiracies depended on each other for success. Lester claims the two conspiracies "so depended on each other for success that the same search [of the St. Louis apartment] stopped them." The government argues that the two conspiracies could not have depended on one another because the arrest of all the major players charged in the Illinois indict-ment effectively ended that conspiracy long before the second conspiracy began.

In response, Lester points to several of our cases in which we have held that "'a co-conspirator's arrest does not automatically terminate a conspiracy; the remaining conspirators may continue to carry out the goals of the conspiracy notwithstanding the arrest of one of the partners.'" *United States v. Haddad,* 976 F.2d 1088, 1093 (7th Cir.1992) (citing *United States v. Mealy,* 851 F.2d 890, 901 (7th Cir.1988)). *See also United States v. Robinson,* 956 F.2d 1388, 1393–94 (7th Cir.1992). Further, Lester contends that even if he and Chuck did take a brief hiatus from dealing cocaine, it was only to avoid getting caught, which "clearly furthers the aims of a conspiracy." *United States v. Troop,* 890 F.2d 1393, 1404 (7th Cir.1989).

Lester's argument does not persuade us that the two conspiracies were really one. We recognize that an arrest does not always terminate a conspiracy; on the other hand, it cannot be said that an arrest *never* terminates a conspiracy. Furthermore, if anything, Lester's argument may convince us that Lester and Chuck had only a single conspiracy with *each other* to distribute cocaine together. As we have said, however, that does not mean that the two men, as a partnership, could not join more than one cocaine distribution conspiracy in the same area at the same or subsequent times. Moreover, it does not demonstrate that the two conspiracies were mutually dependent on each other.

Indeed, we cannot see how the two conspiracies were at all dependent on one another for success. When the Missouri conspiracy began, all the indicted Illinois individuals, save one, were in prison. *See West,* 670 F.2d at 681. There is no evidence that the one Illinois defendant who remained free on bail was involved in the drug transactions charged in the Missouri indictment. There is no suggestion that the jailed Illinois defendants had previously introduced Lester and Chuck to the individuals in St. Louis or that they were even aware of the individuals Chuck and Lester dealt with on the other side of the river. Although one does not have to personally know all the members of a

conspiracy in order to know of the agreement and join it, *United States v. Townsend,* 924 F.2d 1385, 1389 (7th Cir.1991), there is absolutely no evidence in the record from which we can infer that the Illinois defendants were aware of Chuck and Lester's agreement to distribute cocaine with people in St. Louis, much less that they joined it. Nor is there evidence that the Missouri defendants knew of and joined an agreement between Chuck, Lester, the Windtramps and all the others involved in the Illinois scheme to distribute cocaine. *See Dempsey,* 806 F.2d at 768. In essence, Lester has failed to demonstrate that the Missouri conspirators had "any real stake or interest in the success" of the Illinois conspiracy or vice versa. *Thornton,* 972 F.2d at 770. Nor has Lester shown that "the two operations were interdependent or that one facilitated the other." *Townsend,* 924 F.2d at 1393.

■ Notwithstanding our analysis and conclusion under *Castro,* two other arguments merit brief discussion. Lester relies heavily on the fact that a joint plea negotiation for both the Illinois and Missouri cases took place in the St. Louis U.S. Attorney's office. The following personnel were present at that meeting: Lester, Lester's Missouri attorney, Lester's Illinois attorney, the detective in charge of the Windtramps/Illinois investigation and the detective in charge of the Missouri investigation. Lester contends that this meeting demonstrates the government believed that the two conspiracies were related if not the same. We disagree. The question is whether there was one or more illegal agreements to distribute cocaine. We do not find the fact that the government chose to conduct a joint plea negotiation probative of that question. For efficiency reasons alone, the government could have decided to try to dispose of Lester's cases at the same time. The joint meeting does not illuminate the question of whether the conspiracies were one and the same.

■ Lester also argues that the government is "arguing the holes in its case." Boiled down, the claim is that the record does not reflect more overlap between the two conspiracies because the government chose either not to fully investigate the potential overlap or not to present the evidence of overlap it had during the Illinois trial. It is true that the government makes much of the fact that the two primary government investigators, one in Illinois and one in Missouri, were unaware of any overlap between their targets. It is also true that if there was actually only one conspiracy, the defendant could not be charged twice, even if the government was unaware that there was only one conspiracy. *See Thornton,* 972 F.2d at 766.

■ Nonetheless, the burden is on Lester to demonstrate that the two conspiracies were the same. He had an opportunity to submit evidence during his pre-trial double jeopardy hearing. The documentary evidence he presented was insufficient to carry his burden. We find it significant that Lester did not testify during his pre-trial hearing despite a grant of immunity. *See Dempsey,* 806 F.2d at 768. While the defendant is not required to testify at his pre-trial, his double jeopardy argument is weakened when he does not and later claims the government kept pertinent evidence out of his subsequent trial. *Id.* "Had he advanced particulars as to dates of deliveries and linked activities of the persons named in the two indictments, for example, his double jeopardy argument would be more persuasive." *Id.*

In sum, Lester's burden is to convince us that the scope of the conspiracy included individuals on both sides of the river; the evidence he points to in the record is insufficient to meet this burden.

### III. Floyd Dortch: Sufficiency of the Evidence

■ Floyd Dortch argues that his conviction is not supported by sufficient evidence. While he concedes that a drug conspiracy was proved at trial, he maintains that the government failed to prove that he joined the conspiracy. He claims that he had only a buyer/seller relationship with the members of the Windtramps and that he was a competitor of the Lester Dortch/Chuck Vaughn partnership. Because we believe the evidence proved that Floyd Dortch knowingly joined the drug conspiracy, we affirm his conviction.

A defendant who raises a sufficiency of the evidence challenge to his conviction bears a heavy burden. *United States v. Goines,* 988 F.2d 750, 758 (7th Cir.1993). We view the evidence in the light most favorable to the government and draw all reasonable inferences in its favor. *Id.* The conviction stands "if any rational jury could have found the defendant guilty beyond a reasonable doubt." *Id.* (citing *United States v. Curry,* 977 F.2d 1042, 1053 (7th Cir.1992), *cert. denied,* ⎯ U.S. ⎯, 113 S.Ct. 1357, 122 L.Ed.2d 737 (1993)). In conducting our review, we will not reweigh the evidence or evaluate the credibility of witnesses. *United States v. Maholias,* 985 F.2d 869, 874 (7th Cir.1993).

▆▆▆ "To sustain a conspiracy conviction, the government must provide substantial evidence that a conspiracy existed and that the defendant knowingly agreed to join it." *United States v. Pazos,* 993 F.2d 136, 139 (7th Cir.1993). However, the government's evidence can be entirely circumstantial. *Id.* As noted above, Floyd admits a conspiracy was proved; the only question before us is whether the jury could have reasonably inferred that Floyd joined a single agreement to distribute drugs "from the evidence of drug transactions presented by the government." *United States v. Townsend,* 924 F.2d 1385, 1390 (7th Cir.1991).

The government's evidence in this case demonstrated that Floyd, among other cocaine dealers, supplied cocaine to his son, Lester, who in turn supplied it to members of the Windtramps. The evidence also showed that on at least three occasions members of the Windtramps drove to Chicago and obtained cocaine, in distributable amounts, from Floyd personally.[6] Finally, the evidence showed that Floyd "fronted" the Windtramps $600 worth of cocaine on one occasion when they did not have the full purchase price.[7] We believe that this was enough evidence from which the jury could reasonably conclude that Floyd knowingly joined the drug conspiracy.

▆▆ Floyd accurately points out that the mere purchase or sale of narcotics is not sufficient evidence to prove that an individual joined a drug conspiracy. *United States v. Lechuga,* 994 F.2d 346, 349–50 (7th Cir.1993); *Townsend,* 924 F.2d at 1394; *United States v. Baker,* 905 F.2d 1100, 1106 (7th Cir.), *cert. denied,* 498 U.S. 876, 111 S.Ct. 206, 112 L.Ed.2d 167 (1990). However, the evidence in this case goes far beyond a mere purchase or sale of narcotics. Floyd personally made three sales to the Windtramps within a four to six month period. *See United States v. Edwards,* 945 F.2d 1387, 1397 (7th Cir.1991) (defendant's ongoing relationship with members of the conspiracy probative of his membership), *cert. denied,* ⎯ U.S. ⎯, 112 S.Ct. 1590, 118 L.Ed.2d 308 (1992); *United States v. Sergio,* 934 F.2d 875, 879 (7th Cir. 1991) (same).

More importantly, he permitted them to take cocaine without full payment upon delivery. We have consistently held that evidence of "fronting" suggests the existence of a conspiracy because it appears both that the seller has a stake in the success of the buyer's activities and that a degree of cooperation and trust exists beyond that which results from a series of isolated and sporadic transactions. *Townsend,* 924 F.2d at 1406. *See also United States v. Saunders,* 973 F.2d 1354, 1360 (7th Cir.1992), *cert. denied,* ⎯ U.S. ⎯, 113 S.Ct. 1026, 122 L.Ed.2d 171 (1993); *United States v. Blankenship,* 970 F.2d 283, 287 (7th Cir.1992); *Sergio,* 934 F.2d at 879. Moreover, it is perfectly reasonable to view Floyd's decision to accept less than the purchase price on delivery as encouraging the Windtramps to consummate future deals with him.

Recently, we rejected a defendant's "mere buyer-seller" argument and upheld his drug conspiracy conviction. *United States v. Fort,* 998 F.2d 542, 543 (7th Cir.1993). In that case, the defendant approached an individual, Mays, and indicated his desire to buy half a kilogram of cocaine. *Id.* at 543. Mays contacted her connection, who told her that the purchase price was $16,000. *Id.* The defen-

---

**6.** The members of the Windtramps went to Chicago a fourth time to purchase cocaine from Floyd, but were unable to locate him.

**7.** The total purchase price in that transaction was $7,600.

dant was short $600; nonetheless, Mays persuaded her supplier to reduce his price by indicating that the defendant was interested in larger deals in the future and that the defendant's father was a crime boss who would provide the necessary financial support. *Id.* We held that this was sufficient evidence from which a rational jury could conclude that the defendant had joined a separate agreement to distribute cocaine beyond the initial sale. *Id.* at 546. We said, "[t]he jury was entitled to evaluate the testimony and make a credibility determination as to whether there was sufficient evidence to establish an ongoing relationship between Mays and [the defendant]." *Id.*

The foregoing principle is equally applicable in this case. It was up to the jury to determine whether Floyd had an ongoing relationship with other members of the conspiracy which would support the conclusion that he joined the agreement to distribute cocaine to the Windtramps. The jury was given a buyer-seller instruction; its verdict demonstrates that it rejected that interpretation of the facts. We cannot agree that the jury's conclusion was irrational or unsupported by probative evidence. Indeed, the evidence of an ongoing relationship in this case is even stronger than the evidence held to be sufficient in *Fort.* In *Fort,* there was only one completed transaction and a promise of future deals. *Id.* at 543. Here, Floyd completed three transactions, and trial testimony established that a fourth would have occurred if the Windtramps had been able to locate him. This evidence suggests prolonged cooperation, indicating trust and "implying something more than a series of spot dealings at arm's length between dealers who have no interest in the success of each other's enterprise." *Lechuga,* 994 F.2d at 349. *See also United States v. Thompson,* 944 F.2d 1331, 1342–43 (7th Cir.1991) (complexity and number of transactions supported jury's conclusion that the deals were more than "isolated arms-length transactions").

In sum, we are satisfied that the evidence of repeated transactions, one of which included "fronted" cocaine, demonstrated prolonged cooperation between Floyd and the Windtramps from which the jury could reasonably infer that Floyd agreed to participate in a conspiracy with the Windtramps to distribute cocaine. *See Direct Sales Co. v. United States,* 319 U.S. 703, 713, 63 S.Ct. 1265, 1270, 87 L.Ed. 1674 (1943). This is not a case of a mere buyer/seller relationship.

In addition, the evidence of Floyd's frequent sales to Lester and Chuck supports the jury's conclusion that Floyd joined the conspiracy alleged in the indictment. Chuck Vaughn testified that he and Lester bought four to nine ounces of cocaine from Floyd every seven to ten days for a period of four or five months, most of which was sold to the Windtramps. This evidence provides another link between Floyd and the Windtramps.

Floyd argues that the government's evidence was insufficient because it showed he was a competitor of the Lester Dortch/Chuck Vaughn partnership. This argument is meritless. First, we have said that it is possible for two drug suppliers to join the same conspiracy and then compete for customers who are also members of the conspiracy. *Maholias,* 985 F.2d at 876. Second, the evidence here shows that while Floyd may have competed with Lester and Chuck, he was also one of their suppliers. Hence, the fact that Floyd joined the conspiracy can be inferred not only from his direct sales to the Windtramps, but also from his sales to Lester and Chuck, who then sold to the Windtramps.

Because the government presented sufficient evidence from which a reasonable jury could infer that Floyd Dortch knowingly joined the conspiracy alleged in the indictment, his conviction will stand.

### IV. Wilhelm Suess: Use of Proffer and Sufficiency of the Evidence

Defendant Suess raises two challenges to his conviction. First, he contends that the district court erred when it allowed the government to rebut the testimony of a defense witness, Tommie Taylor, with his proffer—that is, the statements Suess made during his unsuccessful plea negotiations. Suess claims that this error prejudiced him and violated his Fifth Amendment rights. Second, Suess argues that there was insufficient evidence to convict him. For the following reasons, we

reject both of Suess' challenges and affirm his conviction.

## A. Use of Proffer to Rebut Defense Witness' Testimony

The following facts are necessary to understand Suess' first challenge. As noted earlier, Suess was charged with one count of conspiracy to distribute in excess of five kilograms of cocaine on June 20, 1991. On September 10, 1991, Suess met with government agents to make a proffer statement to facilitate a plea agreement. Prior to the meeting, Suess and his attorney both signed a form "proffer letter" provided by the government, initialing each of its provisions. During plea negotiations, Suess admitted buying cocaine from the Windtramps partnership. He also admitted to selling cocaine. Plea negotiations were ultimately fruitless and Suess went to trial.

During trial, Suess called Tommie Taylor as a witness. Taylor testified that Suess never bought cocaine from him, Davis or Burkett. Taylor also testified that Suess had never sold cocaine. This testimony was inconsistent with statements Taylor had made during his own plea negotiations. During cross-examination, the prosecutor impeached Taylor with his earlier statements. After Taylor's testimony, the government announced its intention to call a government

agent to testify to both Taylor's and Suess' proffer statements to rebut Taylor's testimony. Suess' counsel objected to the use of Suess' proffer statements. The district court overruled the objection and the government called Illinois State Police Inspector Tom McNamara, who had been present during both Taylor's and Suess' plea negotiations. Inspector McNamara testified that Taylor had told him that Suess bought and sold cocaine and that Suess had admitted to both buying and selling cocaine.

■ Suess' argument is that allowing the government to rebut Taylor's testimony with Suess' proffer statements violated Federal Rule of Criminal Procedure 11(e)(6) and Federal Rule of Evidence 410.[8] Suess contends that Rule 11(e)(6) unequivocally bars the government from using his plea bargaining proffer statements against him in his subsequent trial. In response, the government makes two arguments. First, Suess waived this argument by failing to specifically ground his trial objections in either Rule 11(e)(6) or Rule 410. Second, the government points to the proffer letter Suess signed and initialed prior to plea negotiations and claims that, pursuant to the express terms of the letter, Suess had waived any objection to the government's use of his proffer statements during rebuttal.[9] Leaving aside the issue of

---

8. Rule 11(e)(6) provides:

   (6) **Inadmissibility of Pleas, Plea Discussions, and Related Statements.** Except as otherwise provided in this paragraph, evidence of the following is not, in any civil or criminal proceeding, admissible against the defendant who made the plea or was a participant in the plea discussions:
   (A) a plea of guilty which was later withdrawn;
   (B) a plea of nolo contendre;
   (C) any statement made in the course of any proceeding under this rule regarding either of the forgoing pleas; or
   (D) any statement made in the course of plea discussions with an attorney for the government which do not result in a plea of guilty or which result in a plea of guilty later withdrawn.
   However, such a statement is admissible (i) in any proceeding wherein another statement made in the course of the same plea or plea discussions has been introduced and the statement ought in fairness be considered contemporaneously with it, or (ii) in a criminal pro-

ceeding for perjury or false statement if the statement was made by the defendant under oath, on the record, and in the presence of counsel.
   Federal Rule of Evidence 410 contains identical language.

9. The proffer letter contained the following pertinent provisions, initialed by Suess and his counsel:

   First, no statements or information provided by your client during the "off-the-record" proffer or discussion will be used against your client in any criminal case during the government's case in chief. That is, however, the *only* limitation on the use the government may make of your client's statements.

   *    *    *    *    *    *

   Third, if your client is a witness at any future trials and offers testimony materially different from any statements made or other information provided during the "off-the-record" proffer or discussion, the attorney for the government may cross-examine your client concern-

whether Suess adequately preserved his objection at trial, we conclude that Suess' challenge must fail because Suess waived his rights under Rule 11(e)(6) and Rule 410 when he signed the proffer letter.

■ A defendant waives any objection to the use of his own proffer statements to impeach him at trial when he signs a proffer letter that specifically grants the government permission to impeach him if he testifies inconsistently, and later proceeds to testify inconsistently at trial. *United States v. Goodapple,* 958 F.2d 1402, 1409 (7th Cir.1992). Therefore, it is clear that if Suess had taken the stand and denied selling or buying cocaine, the government could have introduced his proffer statements as well as Agent McNamara's testimony to impeach him. What is equally clear is that the government was permitted to call Agent McNamara to impeach Tommie Taylor with Taylor's own proffer statements regarding Suess' narcotic activities.

The only question before us is whether Suess waived his objection to the use of his proffer statements to impeach Tommie Taylor. We conclude that he did. The proffer letter states that the only limitation on the government's use of the proffer statements is that the government would not introduce the statements during its case in chief. This language suggests that Suess agreed to *any* other use of the statements by the government, which would include using them to impeach the defense witness, Taylor, during cross-examination.

However, there is more specific language that supports our conclusion that Suess agreed to let the government impeach Taylor with Suess' proffer statements. The fourth provision of the agreement permits the government to use proffer statements to "rebut evidence or arguments materially different

from" the proffer statements. This is exactly what the government did in this case. Taylor's testimony that Suess never bought or sold cocaine was materially different from Suess' admissions during his plea negotiations; therefore, the agreement permitted the government to rebut Taylor's testimony with Suess' proffer statements.

■ Suess argues that the legislative intent and purpose behind Rule 410 and Rule 11(e)(6) will be frustrated if we hold that defendants waive their rights by signing a proffer letter like the one in this case. We are not convinced. Suess correctly notes that both rules were designed to facilitate plea bargaining in order to decrease the time and expense of conducting trials. Suess contends that no defendants will plea bargain if they cannot be assured that their statements will not be used against them subsequently. We agree. Thus, absent a waiver, proffer statements are generally not admissible against a defendant. *United States v. Lawson,* 683 F.2d 688 (2d Cir.1982); *United States v. Martinez,* 536 F.2d 1107 (5th Cir.), *cert. denied,* 429 U.S. 985, 97 S.Ct. 505, 50 L.Ed.2d 597 (1976).

■ However, when the defendant executes a waiver before any statements are made, we do not believe that plea negotiations are jeopardized. The defendant is aware, before his initial conversation with the government, that if he later makes inconsistent statements at trial or elicits evidence inconsistent with his proffer statement from other witnesses at trial, those statements of his can be used against him. Suess suggests that defendants are put in an untenable "Catch–22" position, because they must sign the proffer letter, waiving their rights, in order to enter into plea negotiations with the government. This argument is without merit. First, defendants may waive rights, even constitutional rights. *See United States v.*

ing any statements made or other information provided during the "off-the-record" proffer or discussion. This provision is necessary in order to assure that your client does not abuse the opportunity for an "off-the-record" proffer or discussion, does not make materially false statements to a government agency and does not commit perjury when testifying at any future trials.

Fourth, the government may use any statements made or other information provided by

your client to rebut evidence or arguments materially different from any statements made or other information provided by your client. This provision is necessary to assure that no court or jury is misled by receiving information materially different from that provided by your client. In addition, we want to emphasize that the above mentioned examples are not totally inclusive of the uses the government may make of your client's "off-the-record" proffer or discussion.

*Ely,* 910 F.2d 455, 459 (7th Cir.1990) (defendant waived Fifth Amendment rights by taking the stand and discussing relevant incriminating material during direct examination); *United States v. Bell,* 901 F.2d 574, 579 (7th Cir.1990) (defendant waived Sixth Amendment right to counsel); *Ray v. Duckworth,* 881 F.2d 512, 519 (7th Cir.1989) (defendant waived Fifth Amendment *Miranda* rights when he made a confession). Moreover, a defendant's decision to waive his rights is generally made with the assistance of counsel; in this case, both Suess and his attorney initialed every provision of the proffer letter, and both signed the accompanying acknowledgement in which Suess specifically waived his rights.[10] Second, the defendant is only harmed by waiving his rights if he elicits or produces inconsistent testimony at a later date. Therefore, holding the defendant to the terms of the proffer letter fosters another laudable policy—encouraging defendants to tell the truth during both plea negotiations and subsequent trials.

We note, however, that there are some limits to the use the government can make of proffer statements by a defendant, even with a valid waiver. For example, the government conceded, at oral argument, that if a codefendant's counsel had inadvertently elicited testimony from Taylor that Suess had never bought or sold drugs, the government could not have used Suess' proffer statements to impeach; it could only have used Taylor's own proffer statements. During argument, Suess' attorney tried to fit this case into such a characterization, stating that it was merely fortuitous that he, as senior counsel for a team of defense attorneys, had called Taylor to the stand because Taylor was called to testify for several defendants. While that appears to be so, it is clear from the record that it was Suess' attorney who elicited the "materially different" testimony from Taylor regarding Suess' drug activities.[11] In such a situation, we do not believe that the defendant should be able to evade the agreement he made with the government solely because he did not take the stand. Instead, just as the defendant must choose whether to protect the proffer statements by not taking the stand, the defendant must choose whether to protect the proffer by carefully determining which lines of questioning to pursue with different witnesses.

Accordingly, we hold that if the defendant elicits or adduces testimony at trial that is "materially different" from his proffer statements, the government may use his proffer statements to impeach the witness if the defendant has executed a valid waiver. Because Suess executed a valid waiver and elicited "materially different" evidence from Taylor during trial, the government's use of Suess' proffer statements to impeach Taylor was proper.

---

**10.** Suess and his attorney signed the following acknowledgment letter:

> I Wilhelm Suess hereby acknowledge that I have read the terms and conditions of this "Proffer Letter" and that my attorney has explained those terms and conditions to me. I have discussed the terms and conditions of the letter with my attorney and I understand my rights and obligations pursuant to this agreement. I understand that I have the right to remain silent and not to discuss any matters which may incriminate me. I nevertheless desire to pursue negotiations with the government and I hereby voluntarily and intentionally waive such rights and willingly agree to make statements and answer questions according to the terms and conditions set forth in this "Proffer Letter."

**11.** The following exchange took place between Suess' attorney and witness Tommie Taylor:

Q: Was Bill Suess a partner?
A: No.
Q: Investor?
A: No.
Q: Did he ever buy drugs from you?
A: No.
Q: To your knowledge, did he ever buy drugs from Davis even?
A: Not to my knowledge.
Q: How about Burkett?
A: I never seen any transaction with anyone.
Q: Did you ever see Bill Suess in any way participate in the planning of any detail of your drug enterprise?
A: No.
Q: Did you ever see Bill Suess sell or buy cocaine from anyone?
A: No.
Q: Did you ever discuss cocaine with Bill Suess?
A: No.
Q: Did you ever see Bill Suess discuss cocaine with anybody?
A: No, I didn't.
Q: So I guess you couldn't have seen him buy cocaine for resale then?
A: No, I never seen him buy cocaine for resale.

## B. Sufficiency of the Evidence

Suess also contends that his conviction for drug conspiracy is not supported by sufficient evidence. This argument has little merit. As outlined above, in a sufficiency of the evidence challenge, we review the evidence and accompanying inferences in the light most favorable to the government. *Goines,* 988 F.2d at 758. The government must present substantial, albeit circumstantial, evidence that a conspiracy existed and that the defendant joined the illegal agreement. *Pazos,* 993 F.2d at 139.

The record reveals overwhelming evidence from which the jury could reasonably conclude that Suess joined the conspiracy to distribute cocaine to the Windtramps. First, numerous witnesses testified that they bought cocaine from Suess at the Windtramps compound. Second, John Davis testified that the Windtramps partnership "fronted" cocaine to Suess on several occasions. Davis' testimony was supported by the Windtramps drug ledger. Davis also testified that he had seen Suess "cut" cocaine, package it in personal use amounts, and sell it. Third, there was evidence that the partnership, in its absence, left Suess in charge of drug sales at the compound on at least one occasion.

Suess points to testimony which shows that he was neither a "partner" with the major conspirators nor an "investor." This evidence does not mean that he could not or did not join the drug conspiracy. All conspirators need not play the same role in a conspiracy as long as there is "one overall agreement among various parties to perform different functions in order to carry out the objectives of the conspiracy." *Maholias,* 985 F.2d at 875 (citing *United States v. Paiz,* 905 F.2d 1014, 1020 (7th Cir.1990), *cert. denied,* 499 U.S. 924, 111 S.Ct. 1319, 113 L.Ed.2d 252 (1991)).

In this case, the evidence of repeated "fronted" cocaine transactions alone would support the jury's conclusion that Suess had knowingly thrown his lot in with the other Windtramps conspirators. *See Saunders,* 973 F.2d at 1354; *Blankenship,* 970 F.2d at 287; *Townsend,* 924 F.2d at 1406. Suess' claim that he merely had a buyer/seller relationship with the other conspirators is ludicrous. The evidence shows that the Windtramps partnership had a keen interest in Suess' success at reselling its cocaine. In other words, both had "a mutual interest in achieving the goal of the conspiracy." *Townsend,* 924 F.2d at 1392. The record reflects multiple transactions over a prolonged period of time. This evidence suggests that transaction costs between the Windtramps partnership, Suess and Suess' customers were quite low, which counsels a finding of conspiracy. *See id.* at 1395.

Suess' conviction is supported by more than sufficient evidence to permit an inference that he joined the conspiracy. We could only be more certain if the government had introduced a signed contract to this effect between Suess and the other conspirators.

## V. Conclusion

Finding that none of the defendants have raised meritorious claims of error, the convictions of Lester Dortch, Floyd Dortch and Wilhelm Suess are AFFIRMED.