33 F.3d 56
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Craig KENNEDY, Defendant-Appellant.
 No. 93-2067.
 United States Court of Appeals, Seventh Circuit.
 Argued Dec. 10, 1993.
Decided Aug. 10, 1994.
 
 1
 Before EASTERBROOK and ROVNER, Circuit Judges, and REINHARD, District Judge*.
 
 ORDER
 
 2
 On September 16, 1992, a federal grand jury in Indianapolis indicted Craig Kennedy, charging him with conspiracy to possess with intent to distribute, and distribution of, in excess of 500 grams of cocaine in violation of Title 21 U.S.C. Secs. 841(a)(1) and 846. The indictment charged that the conspiracy extended from early 1990 to September 1991. On November 10, 1992, an expanded three-count superseding indictment was returned by the grand jury. Count One charged Kennedy with conspiracy to possess with intent to distribute, and distribution of, in excess of five kilograms of cocaine between late 1987 or early 1988 and October 1991. Count Two charged Kennedy with distribution of approximately five ounces of cocaine in February 1991. Count Three charged him with using and carrying a firearm during and in relation to a drug-trafficking crime in violation of Title 18 U.S.C. Sec. 924(c). The jury returned a verdict of guilty on Counts One and Two of the superseding indictment after a two-day trial.[1]
 
 
 3
 Kennedy was sentenced to concurrent terms of 420 months imprisonment on Count One and 120 months imprisonment on Count Two. He appeals his conviction and sentence.
 
 I. DISCUSSION
 
 4
 Kennedy first argues that the evidence was insufficient to support a verdict of guilty as to Count One of the indictment. He maintains that rather than a single conspiracy, the trial testimony established multiple conspiracies between each of the government's witnesses and himself.
 
 
 5
 We need not linger over this argument. A conviction is supported by sufficient evidence if, when viewing the evidence in the light most favorable to the government, we are able to conclude that a rational jury could have found each of the essential elements of the offense beyond a reasonable doubt. United States v. Carson, 9 F.3d 576, 582 (7th Cir.1993), petition for cert. filed (U.S. May 16, 1994). Viewing the evidence in the light most favorable to the government, the proof establishes that Kennedy was the pivotal figure in the conspiracy and that regardless of what else was occurring with the other members, he was continuously involved in a single conspiracy.
 
 
 6
 It does not matter that Kennedy both sold and bought cocaine from various members of the conspiracy. The conspiracy had one aim--that being the trafficking of cocaine--and the fact that the participants performed different functions at different times does not negate the furtherance of that central objective. United States v. Soto-Rodriguez, 7 F.3d 96, 100 (7th Cir.1993) (quoting United States v. Sababu, 891 F.2d 1308, 1322 (7th Cir.1989)).
 
 
 7
 Kennedy's second argument on appeal is that he was denied his right to a speedy trial. The government contends initially that the filing of a superseding indictment some fifty-five days after the original indictment was returned started the seventy-day speedy trial clock running anew. It is true that the superseding indictment did add two new charges (distribution of cocaine and the use or carrying of a firearm in connection with drug trafficking), and these charges would merit a fresh seventy days. United States v. Piontek, 861 F.2d 152, 153 (7th Cir.1988); see n. 2, infra. But what of the conspiracy charge in the original indictment? As we observed in United States v. Thomas, 788 F.2d 1250, 1258 (7th Cir.), 479 U.S. 853, 107 S.Ct. 187 (1986), "[t]he superseding indictment does not affect the running of the time on ... charges that were in the original indictment as well as the superseding indictment." Moreover, the speedy trial clock continues to run not only on offenses actually charged in the original indictment, but on those required under double jeopardy principles to be joined with the original offenses as well. United States v. Marshall, 935 F.2d 1298, 1302 (D.C.Cir.1991); United States v. Gonzales, 897 F.2d 1312, 1316 (5th Cir.1990), cert. denied, 498 U.S. 1029, 111 S.Ct. 683 (1991); United States v. Maloy, 835 F.Supp. 1373, 1375 (M.D.Fla.1993); but see United States v. Lattany, 982 F.2d 866, 872 n. 7 (3d Cir.1992), cert. denied, 114 S.Ct. 97 (1993). The government reasons that the conspiracy charge in the superseding indictment was "new" given the expanded time frame and greater amount of cocaine involved. These changes may have constituted more than mere embellishments or technical modifications ( see United States v. Savage, 863 F.2d 595, 597 (8th Cir.1988), cert. denied, 490 U.S. 1082, 109 S.Ct. 2105 (1989)), but the thrust of the charge--the agreement to possess cocaine with the intent to distribute--remained the same. Indeed, it is clear that the conspiracy alleged in the first indictment is the same conspiracy alleged in the second. The time frame of the first is wholly subsumed within the conspiracy charged in the superseding indictment, and although the later indictment identifies more overt acts and individuals who bought from and sold to Kennedy, each act and individual named in the original indictment is named in the superseding indictment as well. Compare R. 3 paragraphs 1-3 with R. 11 paragraphs 4-6. Indeed, the government does not attempt to argue that these were two different conspiracies; its real contention is that the superseding indictment assigned a broader scope to the conspiracy than did the first indictment. We are therefore confident that had Kennedy been tried and either convicted or acquitted on the conspiracy as originally charged, double jeopardy would preclude the government from trying him on the conspiracy as charged in the superseding indictment. See generally United States v. Dortch, 5 F.3d 1056, 1061 (7th Cir.1993), petition for cert. filed (U.S. Dec. 20, 1993) (No. 93-7218), and cert. denied, 114 S.Ct. 1077 (1994). Accordingly, we believe that the speedy trial clock did not begin to run anew as to the conspiracy charge upon filing of the superseding indictment.[2] Trial did not commence until 119 days after return of the original indictment. Thus, absent some basis for tolling the speedy trial clock, dismissal of the conspiracy charge would be required.
 
 
 8
 The government argues alternatively that a sufficient number of days may be excluded from the speedy trial calculation for pre-trial motions. See 18 U.S.C. Sec. 3161(h)(1)(F), (J). We agree. Kennedy filed a motion requesting a bill of particulars on October 2, 1992, and a motion for revocation or amendment of a detention order on October 9. Both were disposed of on October 15, 1992, permitting an exclusion of 13 days. On October 16, Kennedy filed a request for additional time in which to file further pre-trial motions. The court granted that motion on October 20, allowing Kennedy ten days beyond the government's production of discovery materials to his counsel in which to file any motions. The four days in which the request for additional time was pending may of course be excluded. And, presumably, the clock remained tolled until ten days after discovery was produced, as the court had set this time aside for the filing of additional pre-trial motions (although ultimately there were none). See United States v. Tibboel, 753 F.2d 608, 610 (7th Cir.1985). Unfortunately, neither the briefs nor the record reveal exactly when the period allotted for additional defense motions actually expired. The government's speedy trial calculation appears to assume that this period had not yet ended as of November 19, when Kennedy filed an objection to the scheduled trial date on speedy trial grounds; it therefore excludes the full thirty days from October 20 (when the court allowed Kennedy additional time for motions) and November 19. Kennedy does not appear to dispute that the motions period had not yet expired; nonetheless, he maintains that the exclusion of time ceased, at the latest, on November 10, 1992, when the superseding indictment was filed. We are not sure why the superseding indictment should be deemed to have terminated the pre-trial motions period, however. After all, Kennedy's argument is that but for the gun charge (which was later dismissed), the superseding indictment was not substantively distinct from the original indictment; if not, then we see no reason why ongoing periods of excludable time should be terminated simply because a superseding indictment was filed. See Gonzales, 897 F.2d at 1316-17 (superseding indictment does not terminate exclusion for pre-trial motions unless the new indictment renders those motions moot). Alternatively, Kennedy suggests that it is inappropriate to exclude any time for this motions period given its indeterminate nature. Because the length of the motions period turned on when the government produced discovery to the defense, Kennedy reasons, the government was given the power to manipulate the speedy trial clock by delaying production. We agree with Kennedy that it is preferable for the court to set a date certain when the speedy trial clock is involved. Cf. Thomas, 788 F.2d at 1258 ("the Speedy Trial Act should be interpreted to allow precise computations of the remaining time"). And we recognize that there is some potential for abuse by the government in arrangements such as this one. Cf. Piontek, 861 F.2d at 154. Nonetheless, Kennedy has not alleged any bad faith upon the part of the government; indeed, the additional time for motions was granted at his request, and there is no indication in the record that he objected to the terms on which it was granted. See Piontek, 861 F.2d at 154; see also Gonzales, 897 F.2d at 1316. Thus, because the parties appear to agree that the motions period had not yet expired as of November 19, 1992, when Kennedy filed his speedy trial objection, we agree with the government that an additional thirty days may be excluded. Finally, Kennedy agrees that an additional four days may be excluded for the time between the filing of this objection and the court's ruling upon it. Together, all of these periods add up to fifty-one days of excludable time. Deducting these from the 119 days between the original indictment and trial nets a figure of sixty-eight days, placing Kennedy's trial within the mandated seventy-day period. Thus, on the record before us, we find no speedy trial violation.
 
 
 9
 Kennedy's third argument involves certain evidence that Kennedy contends was evidence of a "prior bad act" governed by Fed.R.Evid. 404(b). Kennedy argues that the government was obliged to notify him of its intent to offer this evidence in advance of trial, which it did not do.
 
 
 10
 The evidence at trial revealed that in August 1990, Officer Thomas Shaffer and another Indianapolis police officer embarked in pursuit of the car in which Kennedy was a passenger. When the car stopped, Kennedy exited holding a grocery bag in his hand. Kennedy fell to the sidewalk, and at that point, Officer Shaffer saw currency and two bags of a white powder substance fall out of the grocery bag. Officer Shaffer then saw Kennedy grab the two bags of white powder, stuff them back in the grocery sack, and run away, leaving behind the money, which totalled $17,080 in United States currency.
 
 
 11
 The government is correct in asserting that Kennedy misses the point of Officer Shaffer's testimony. That testimony was neither offered nor admitted as 404(b) evidence. The testimony was instead direct evidence of the charged trafficking operation, and thus only the balancing test of Fed.R.Evid. 403 need be considered. The evidence was introduced to establish that Kennedy possessed both a large amount of currency and two bags of a white powdery substance, both of which might reasonably be seen as hallmarks of drug trafficking, and that rather than fleeing with the money, he chose to abandon the $17,080 and instead grab the two bags of white powder. The obvious import of his actions is that he believed the substance to be more valuable than the cash. In reviewing the district court's decision to admit evidence, we will reverse only if the district court abused its discretion. United States v. Macey, 8 F.3d 462, 466 (7th Cir.1993). There is no question that the probative value of Officer Shaffer's testimony outweighed its prejudicial effect, and the testimony thus is admissible under Rule 403. Here the district court did not abuse its discretion in admitting the testimony of Officer Shaffer.
 
 
 12
 Because it can be dealt with summarily, we next consider, out of turn, Kennedy's fifth issue. He maintains that the district court erred in enhancing his base offense level by four for being "an organizer or leader" under Sentencing Guideline Sec. 3(B) 1.1 without setting forth specific findings. The testimony of Kennedy's co-conspirators at trial clearly established that he was the "leader or organizer" of the conspiracy. And contrary to Kennedy's contention, the district judge did make a specific finding to this effect at sentencing:
 
 
 13
 He is, in my opinion, the organizer and leader of this group. If not, who? He is the person they all look to and who, of course, brought in all the cocaine or had it brought in from both Detroit and Chicago. And I have no doubt but what he did threaten various people or have them threatened as has been testified.
 
 
 14
 The addition of a four level enhancement to the base offense level was not clearly erroneous.
 
 
 15
 We now turn to Kennedy's fourth and most substantive argument on appeal. He contends that the district court erred in calculating a base offense level of 34 based on the possession and distribution of 15 kilograms or more of cocaine.
 
 
 16
 A district court's calculation of the quantity of drugs that may be attributed to the defendant is a factual finding that we review under a clearly erroneous standard. United States v. Beler, 20 F.3d 1428, 1431 (7th Cir.1994). Under this standard, we will set aside the calculation only when "on the entire evidence [we are] left with the definite and firm conviction that a mistake has been committed." United States v. Duarte, 950 F.2d 1255, 1265 (7th Cir.1991) (internal quotations, citations omitted), cert. denied, 113 S.Ct. 174 (1992). The government bears the burden of establishing the quantity of drugs for which Kennedy is responsible by a preponderance of the evidence. See Beler, 20 F.3d at 1431. Unfortunately, our review in this case is made more difficult by the highly cursory nature of the district court's assessment of the drug quantity attributable to Kennedy. The pre-sentence report prepared by the Probation Office set out in some detail the transactions in which Kennedy purportedly was involved. Kennedy specifically objected to the Probation Officer's conclusion that he had possessed in excess of fifteen kilograms, however, suggesting that the total was at most between five and fifteen kilograms. R. paragraphs 7, 10. In an effort to overcome that objection, the government presented substantial testimony on this subject at the sentencing hearing in addition to that already elicited at trial. Despite the dispute and the degree of attention given it by the parties and the Probation Officer, the district court simply stated, at the conclusion of the sentencing hearing, "Well, having heard the evidence in this case, both at the time of Mr. Kennedy's trial and again today, I am satisfied that the amount of cocaine involved here in this conspiracy was clearly in excess of 15 kilograms." Sentencing Tr. 77. The court did not identify what testimony it was or was not relying on, nor which among the many transactions cited by the government it was or was not including in its calculation. Indeed, it did not even indicate whether it was adopting the findings of the pre-sentence report on this matter. See id. We thus examine the record as a whole to determine whether the evidence supports the district court's finding, focusing on the particular transactions and testimony that the parties have highlighted in the briefing.
 
 
 17
 Kennedy first contends that the evidence shows that Stanton Bowie purchased only three kilograms of cocaine from him during the course of the conspiracy. The government, however, argues that Bowie purchased 5.25 kilograms. We find that Kennedy is clearly correct from both a reading of the pages cited by the government and the transcript of Bowie's entire testimony. Consider the following:
 
 
 18
 Q: Mr. Bowie, from the time you started purchasing quarter-ounces of cocaine from Craig Kennedy in late 1987 until you stopped dealing with him sometime in 1990, how much total cocaine do you estimate that you purchased from him?
 
 
 19
 A: Around three keys.
 
 
 20
 Q: Three kilograms?
 
 
 21
 A: Yes.
 
 
 22
 (Tr. 59-60). And further:
 
 
 23
 Q: What did you do with this approximately three kilograms of cocaine you purchased from Craig Kennedy during this time period?
 
 
 24
 A: I sold it.
 
 
 25
 Q: How much money do you estimate you made during the time period that you purchased this three kilograms of cocaine and sold it?
 
 
 26
 The government cites no additional evidence in the record that would support a finding that Kennedy sold more than three kilograms to Bowie.
 
 
 27
 The government also posits that Kennedy sold Shawn Kimbrough three kilograms of cocaine. However, examining the transcript, we note that Kimbrough testified as follows:
 
 
 28
 Q: Can you tell us about how much you got from Craig Kennedy?
 
 
 29
 A: From '90 to '91?
 
 
 30
 Q: Yes.
 
 
 31
 A: Probably about two keys.
 
 
 32
 Q: When you say about two keys, do you think it would be a little more or a little less?
 
 
 33
 A: A little more.
 
 
 34
 Q: A little more than two kilos?
 
 
 35
 A: Yes.
 
 
 36
 (Trial Tr. 103). At page 109, Kimbrough is asked:
 
 
 37
 Q: Well, what happened then?
 
 
 38
 A: After he gave them the money, he cut open the Tide washing powder box, pulled out a key.
 
 
 39
 If Kimbrough's testimony had ended there, the government would surely be correct in its allegation that Kennedy gave Kimbrough a total of three kilograms of cocaine. However, at page 111, the following exchange took place, raising a question as to the disposition of the third kilogram in the box of Tide:
 
 
 40
 Q: Is that a kilogram of cocaine?
 
 
 41
 A: Yes.
 
 
 42
 Q: Do you know what happened to that cocaine?
 
 
 43
 A: He (Kennedy) put it up, put it in a closet.
 
 
 44
 Q: Do you know whether or not it was sold.
 
 
 45
 A: No.
 
 
 46
 Q: Did you get any of that cocaine?
 
 
 47
 A: Well, that day, I got two grams of it. (emphasis supplied)
 
 
 48
 Q: Did any of that cocaine go anywhere else you know of?
 
 
 49
 A: Yes.
 
 
 50
 Q: What happened to it?
 
 
 51
 A: He was giving out samples.
 
 
 52
 Q: Who was giving out samples?
 
 
 53
 A: Craig.
 
 
 54
 Q: What does that mean, giving out samples, is that like at the grocery store where the little lady stands there with a plate?
 
 
 55
 A: He was giving it to people to test.
 
 
 56
 Q: What did you do with yours?
 
 
 57
 A: I sold mine.
 
 
 58
 The "mine" that Kimbrough sold was two grams. The trial transcript thus convincingly reflects distribution to Kimbrough of "a little more than 2 kilograms" plus these two grams, not the full three kilograms that the government has attributed to Kimbrough. Nonetheless, it is ultimately immaterial that Kimbrough received only two grams of the third kilogram. His testimony establishes that Kennedy did possess that kilogram and did distribute at least some portion of it, if not to Kimbrough alone. Therefore, the full kilogram may be attributed to Kennedy.
 
 
 59
 The government avers that Kennedy sold Eric Young 1.14 kilograms, whereas Kennedy maintains that the testimony shows he sold only 14 ounces (approximately .397 kilograms) to Young. At page 177 of the transcript, Young is asked:
 
 
 60
 Q: What were the circumstances the first time you purchased cocaine from Craig Kennedy?
 
 
 61
 A: What did I buy from him?
 
 
 62
 Q: Yes.
 
 
 63
 A: Quarter key.
 
 
 64
 Q: Tell the jury what a quarter key is.
 
 
 65
 A: Nine ounces of cocaine.
 
 
 66
 At page 194, Young testified that he received another five ounces from Kennedy packaged in a pink Pamper's diaper. At page 201, Young was asked:
 
 
 67
 Q: Did you have any other conversation or transactions with Craig Kennedy concerning cocaine after that transaction there? (The five ounce transaction)
 
 
 68
 A: No.
 
 
 69
 Thus, the testimony supports Kennedy's figure of 14 ounces (.397 kilograms). Again, we are mystified as to how the government has come up with 1.14 kilograms after viewing the trial transcript.
 
 
 70
 The government and the defense are nearly in synch as to Darryl Milam's actual purchases. The government maintains that he bought .75 kilograms from Kennedy, and Kennedy agrees that the evidence shows that Milam purchased .76 kilograms from him.
 
 
 71
 At sentencing, Roman French testified to additional purchases of cocaine from Kennedy. The government argues that this testimony establishes sales of 2.67 kilograms, but Kennedy maintains that it establishes no more than one additional kilogram. French testified as follows:
 
 
 72
 Q: Now, when did you do this drug deal with Mr. Kennedy? Well, when was the time period?
 
 
 73
 A: From when I first started in '89.
 
 
 74
 Q: About when in '89?
 
 
 75
 A: When I first started in '89, it was probably around February or March.
 
 
 76
 Q: And how long did you purchase drugs from Craig?
 
 
 77
 A: Probably from May of '89 up until the time I got locked up in January of '90.
 
 
 78
 Q: So approximately eight to nine months? And you are saying that you were buying about three ounces a week, is that right?
 
 
 79
 A: Yes, sir.
 
 
 80
 (Sentencing Tr. 18).
 
 
 81
 The sale of three ounces a week for eight months would amount to approximately 96 ounces of cocaine (2.72 kilograms); therefore the government's figure of 2.67 kilograms is in the ballpark.
 
 
 82
 When the various sales are added up, however, rather than the 12.81 kilograms the government alleges and the district court accepted, the actual amount involved is in the vicinity of 9.817 kilograms.
 
 
 83
 The government further insists that the six kilograms of cocaine Kennedy negotiated to purchase from Darryl Milam should be included in the sentencing computation.
 
 
 84
 According to the government, the evidence at trial showed that Milam agreed he could sell Kennedy six kilograms of cocaine for $150,000; and, in fact, six kilograms of cocaine were discovered in Milam's possession at the time of his arrest. Kennedy argues, however, that there was no proof that these six kilograms were in fact the same six kilograms that Milam had discussed selling to Kennedy. Kennedy notes that when he pointed this out at sentencing, the government argued that he (Kennedy) should have asked Milam questions to flesh out the answer during cross-examination at trial. But we agree with the defense that it was the government's burden to establish the relevant facts on this point. And as the government conceded at oral argument, the record does not establish that the six kilograms of cocaine found in Milam's possession at the time of his arrest were in fact meant for Kennedy. Rather:
 
 
 85
 THE GOVERNMENT: ... I think it was a question had Mr. Milam not been arrested and Mr. Kennedy approached Mr. Milam with $150,000, Mr. Milam would have sold the six kilograms of cocaine to Mr. Kennedy. The point being that Darryl Milam, at that time, obviously had the ability to acquire that amount of cocaine and from the evidence that had been submitted at trial, Mr. Kennedy had the ability to possess and move large quantities of cocaine and also possess large sums of currency.
 
 
 86
 THE COURT: How do we know it was the same six kilos?
 
 
 87
 A: I don't know that we specifically do, I think that we only know that the ability of both parties to consummate that deal was there and available had it not been for the arrest and the seizure of the six kilograms. I think inferentially, because of the facts in the case overall, that the ability of both parties to conclude that transaction existed. We can't say it was the same six kilograms.
 
 
 88
 Nor can we. However, we do agree with the government that under these circumstances the parties' willingness and ability to execute the transaction may support the attribution of an additional six kilograms to Kennedy. If the purchase had been arranged and would have gone forward but for Milam's arrest, then Kennedy's efforts could be considered an attempt to purchase the six kilograms for which he may be deemed responsible. See United States v. Morrison, 946 F.2d 484, 501 (7th Cir.1991), cert. denied, 113 S.Ct. 826 (1992); United States v. White, 888 F.2d 490, 499-500 (7th Cir.1989). However, we are hampered in our review by the lack of specific findings by the district court as to whether and if so, why it included this transaction in its calculations. Accordingly, we leave it to the district court to explore the matter further on remand.
 
 
 89
 We also have questions regarding the seizure of currency which the government argues was intended for the purchase of cocaine or which represented proceeds received by Kennedy from the sale of cocaine. For these amounts to be factored into the drug quantity calculation, one must assume either that the cash represented proceeds from cocaine sales not already included in the offense level or was money intended to pay for cocaine not already counted. We find the record insufficient to support that assumption, however. For example, the government itself noted at oral argument that Kennedy gambled in large sums, a circumstance suggesting that not all of the money in his possession was necessarily derived from or intended for cocaine trafficking. There was also testimony indicating that at least one of his sources of cocaine would extend him credit and accept payment from the proceeds of Kennedy's subsequent sales. Tr. 55. This type of arrangement demonstrates the need for care in ascertaining the specific purpose of a sum of money found in Kennedy's possession at a given time--to consider, for example, whether it was intended as payment to a supplier for a transaction already included in the drug quantity calculation, or whether it was profit from already counted transactions that Kennedy did not intend to plow back into his trafficking operation. We discern no evidence or finding that would support the government's position that all of these sums may be assumed to constitute payment for or the proceeds of transactions not already figured into the total. That issue must likewise be examined by the district court on remand.
 
 II. CONCLUSION
 
 90
 For the reasons given above, we AFFIRM Kennedy's conviction. We find inadequate support in the record, however, for the fifteen-kilogram quantity of cocaine underlying Kennedy's base offense level. We therefore VACATE his sentence and REMAND for re-sentencing consistent with this opinion. We remind the parties and the district court that the drug quantity attributed to Kennedy must be supported by appropriately detailed findings. See, e.g., United States v. Mumford, 25 F.3d 461, 466-67 (7th Cir.1994); United States v. Yanez, 985 F.3d 371, 376-78 (7th Cir.1993); United States v. Spears, 965 F.2d 262, 273-74 (7th Cir.1992); United States v. Banks, 964 F.2d 687, 692-93 (7th Cir.1992), cert. denied, 113 S.Ct. 470 (1992).
 
 
 
 *
 The Honorable Philip G. Reinhard, of the Northern District of Illinois, sitting by designation
 
 
 [1]
 On January 15, 1993, the district court granted the government's motion to dismiss Count Three of the superseding indictment
 
 
 [2]
 Notwithstanding Kennedy's argument to the contrary, we agree with the government that the clock returned to zero with respect to the substantive possession charge in Count Two of the superseding indictment, for that is an offense independent of the conspiracy charge and therefore not subject to the double jeopardy bar. United States v. Felix, 112 S.Ct. 1377, 1384-85 (1992)